[612 NYS2d 635]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
MICHAEL QUARTARARO, Appellant.

Second Department, May 31, 1994

## APPEARANCES OF COUNSEL

*Michael Quartararo, pro se,* and *James A. Cohen,* New York City *(Joanne Cicala, Jack Dennehy* and *Kevin Puvalowski* on the brief), for Michael Quartararo, appellant.

*James M. Catterson, Jr., District Attorney* of Suffolk County, Riverhead *(Mark D. Cohen, Steven A. Hovani, Patricia A. Murphy, Glenn Green* and *Patricia M. Filberto* of counsel), for respondent.

### OPINION OF THE COURT

BRACKEN, J. P.

█ In a criminal case, a change of venue will be warranted as a matter of due process (US Const 14th Amend; NY Const, art I, § 6), when it is proved that the assembly of an impartial jury in the venue to which a transfer is sought is possible, whereas the assembly of an impartial jury in the original venue is not. The propriety of this remedy does not hinge solely on proof of the extent to which the original venue has been saturated with pretrial publicity. Instead, the propriety of this remedy hinges on proof of the extent to which, as between the original venue and the venue to which a transfer is sought, significantly different levels of "saturation" have been reached, thus rendering the selection of a fair jury impossible in the one place and possible in the other. Considering all the relevant factors, we conclude that the defendant has failed to show his entitlement to the extraordinary remedy of having his trial moved from Suffolk County.

The defendant Michael Quartararo is one of four individuals who took part in the 1979 murder of 13-year-old John Pius. He was found guilty of murder in the second degree (two counts) after a trial in 1981 and this conviction was affirmed on appeal *(see, People v Quartararo,* 113 AD2d 845). In 1988, while the defendant was serving the sentence imposed in 1981, the United States District Court for the Eastern District of New York granted a petition for a writ of habeas corpus and directed that the defendant be released from prison unless a new trial were to be commenced within 90 days *(see, Quartararo v Fogg,* 679 F Supp 212, *affd* 849 F2d 1467). The defendant was given his second trial in 1990, and, at the conclusion of this trial, he was convicted of murder in the second degree under Penal Law § 125.25 (1). We again affirm.

The defendant's primary argument is that it was impossible for him to receive a fair trial in Suffolk County. In advancing this argument, the defendant asserts that 95% of the original pool of prospective jurors had some knowledge of the Pius case and that only 37.7% of the original venirepersons with knowledge indicated that they could be fair. He also states that even

after 100 potential jurors who had some knowledge of the Pius case had been excused by the trial court, a majority of those with knowledge of the case who remained in the pool (94 out of 181, or 52%) "expressed a disqualifying prejudice". The defendant also emphasizes that out of the 12 jurors and two alternates ultimately selected, only two knew nothing about the Pius case and five knew that the defendant was being retried.

The People respond to this argument by asserting that "seated jurors with prior knowledge gave the court sworn assurances that they could put aside any previously obtained information and decide the case on the facts presented at trial". The People claim that, with the exception of juror number two, "any actual knowledge of the sworn jurors was limited to awareness of very general information". For the following reasons, we agree that the defendant was not deprived of his right to an impartial jury (see, US Const 6th, 14th Amends; see also, NY Const, art I, §§ 2, 6).

■ As a preliminary matter, we must consider what effect, if any, this Court's prior order denying the defendant's motion for a change of venue (see, CPL 230.20 [2]) has on the scope of our power to review the defendant's argument that it was impossible for him to receive a fair trial in Suffolk County. The factual predicate upon which the defendant bases this argument is essentially no different from that upon which he based his prior motion for a change of venue, and so the doctrine of "the law of the case" is potentially implicated (see, People v Brown, 136 AD2d 1, 12; People v Knapp, 113 AD2d 154). In order to avoid the consequences which strict application of this doctrine might have, the defendant notes that "the entire record of voir dire is now before this Court for the first time". The People suggest that it was the defendant's responsibility to have the minutes of voir dire supplied to this Court at the time of his earlier motion.

Under these circumstances, we conclude that review of the merits of the defendant's contention is warranted. Whatever effect the doctrine of law of the case might have on our power to review the merits of the defendant's contention, we do not believe that this doctrine would ever compel us to arrive at a conclusion, on the merits, which we ourselves thought was manifestly erroneous (see, e.g., People v Martinez, 194 AD2d 741, 741-742, citing People v Barnes, 155 AD2d 468; People v Taylor, 87 AD2d 771, affd 57 NY2d 729; see also, People v Williams, 188 AD2d 573; People v Claudio, 130 AD2d 759). In

the context of the present case, the question of the extent to which the doctrine of the law of the case is an "absolute mandate" *(cf., People v Williams, supra,* at 574) is at any rate essentially academic. This is so because we conclude, on the merits, that this Court's earlier refusal to grant the defendant's motion to change venue was not erroneous, "manifestly" or otherwise *(cf., People v Brown, supra),* but was instead wholly correct, whether judged against the record that was before the Court at that time or judged against the present record on appeal.

■ None of the statistics cited by the defendant on appeal is sufficient to destroy the presumption that prospective jurors are capable of putting aside whatever preconceptions they might initially have as the result of external influences and of deciding the case strictly in accordance with the trial court's instructions and in accordance with the evidence *(see, e.g., Murphy v Florida,* 421 US 794; *Beck v Washington,* 369 US 541, 555-558; *Irvin v Dowd,* 366 US 717, 722-723; *Reynolds v United States,* 98 US 145, 155-156; *People v Moore,* 42 NY2d 421, 432; *People v Genovese,* 10 NY2d 478, 482; *People v Parnes,* 161 AD2d 615; *People v McClary,* 150 AD2d 631; *People v Sims,* 110 AD2d 214, 225; *People v Costello,* 104 AD2d 947, 948; *People v Harris,* 84 AD2d 63, 100-101, *affd* 57 NY2d 335, *cert denied* 460 US 1047). The defendant's trial was not presumptively unfair, either because 95% of the prospective jurors had heard of the Pius case or because the Pius case was familiar to 10 out of the 12 jurors ultimately selected. Also, the fact that approximately two thirds of the original jury expressed what the defendant describes as a "disqualifying prejudice" does not, in and of itself, warrant the conclusion that the defendant could not receive a fair trial in Suffolk County.

The case which provides us with the most unmistakable guidepost is *Patton v Yount* (467 US 1025). The *Patton* case *(supra)* resembles the present case in that it involved a lengthy chronology, extending for four years, from the time of the defendant's crime in 1966 until the time of the defendant's second trial in 1970. Like the present case, *Patton v Yount (supra)* involved a defendant who had been convicted at his first trial, at which time he had unsuccessfully asserted an insanity defense, and who had later obtained a reversal on appeal based on what a layperson might regard as a "technicality" *(see, Commonwealth v Yount,* 435 Pa 276, 256 A2d 464, *cert denied* 397 US 925). The pretrial publicity in *Patton*

included front-page and "banner headline" coverage of the 1966 homicide, the 1969 reversal on appeal, and the subsequent change of venue motion; these reports were disseminated by two local newspapers in a county with a population of 70,000 people. In *Patton v Yount (supra,* at 1029), almost 100% of the original venirepersons (161 out of 163) had heard of the case. Notwithstanding the presence of these circumstances, the Supreme Court held that the defendant had not been deprived of his Sixth Amendment right to an impartial jury *(see,* US Const 6th, 14th Amends).

In *Patton v Yount (supra),* the Supreme Court attached great significance to the fact that several years had elapsed between the time of the defendant's crime and the time of the defendant's second trial. "That time soothes and erases is a perfectly natural phenomenon", the Court stated at one point, adding that " '[t]he passage of time is a great healer' " *(Patton v Yount, supra,* at 1034, quoting *Irvin v Dowd,* 271 F2d 552, 561 [Duffy, J., dissenting], *revd* 366 US 717). We ourselves have stated in connection with the appeal of another Pius defendant that the passage of time "permit[ted] local passion and prejudice to cool" *(People v Ryan,* 93 AD2d 848, 849). In one of our several "Brinks case" decisions *(People v Boudin,* 90 AD2d 253, 257), we stated that "the intensive news coverage accorded * * * to a crime of this nature could well be expected to abate with the passage of time, thus permitting 'the fires of prejudice [to] cool' " (quoting *Groppi v Wisconsin,* 400 US 505, 510).

Several courts have noted that the temporal lapse between the time of a newsworthy item's peak publicity and the time of the defendant's trial is a crucial factor in determining whether an impartial jury can be assembled *(e.g., Beck v Washington, supra,* at 556-558; *Stroble v California,* 343 US 181; *United States v Lehder-Rivas,* 955 F2d 1510, 1523-1524, *cert denied sub nom. Reed v United States,* — US —, 113 S Ct 347; *Wansley v Slayton,* 487 F2d 90, *cert denied* 416 US 994; *United States v Bowe,* 360 F2d 1, *cert denied* 385 US 961; *United States ex rel. Brown v Smith,* 306 F2d 596, *cert denied* 372 US 959; *People v Barber,* 93 Ill App 3d 911, 418 NE2d 439; *People v Knippenberg,* 70 Ill App 3d 496, 388 NE2d 806; *State v Needs,* 99 Idaho 883, 591 P2d 130).

Eleven years elapsed between the discovery of John Pius' body in 1979 and the defendant's second trial in 1990. The bulk of the news reports concerning the Pius case which have appeared in more recent years were concerned less with the

factual details of the homicide itself, and still less with the defendant's alleged participation in that homicide, as with a banal recitation of the various setbacks suffered by the People in their efforts to prosecute the Pius defendants. If these largely factual news accounts have been accompanied by any degree of prejudicial editorial comment, such comment has generally been "aimed at the * * * criminal justice system in general" *(Mu'Min v Virginia,* 500 US 415, 429). The straightforward accounts of the vicissitudes of the Pius case are not "of such a sensational character as to excite local popular passion and prejudice" *(People v DiPiazza,* 24 NY2d 342, 347; *see also, People v Laezza,* 143 AD2d 289). These factual news reports "furnish no basis for a court to presume that an unbiased jury could not be selected" *(United States v Medina,* 761 F2d 12, 19; *see also, United States v McNeill,* 728 F2d 5, 9).

The defendant relies most heavily on the last of three decisions issued by this Court in 1982 and 1983 in connection with the then-famous "Brinks case" *(see, People v Boudin,* 90 AD2d 253, *supra* [changing venue from Rockland County to Orange County]; *People v Boudin,* 95 AD2d 463 [denying motion to change venue from Orange County]; *People v Boudin,* 97 AD2d 84 [changing venue from Orange to Westchester County]). In *People v Boudin* (97 AD2d 84, *supra),* the Court relied principally on the fact that 55% of the venirepersons had expressed an inability to be fair and, citing Federal precedent *(e.g., Murphy v Florida,* 421 US 794, *supra; Smith v Phillips,* 455 US 209; *Irvin v Dowd,* 366 US 717, *supra),* the Court concluded that this circumstance, together with all the others presented, warranted a change of venue.

The *Boudin* case relied upon so heavily by the defendant is distinguishable, most obviously, in that it involved an application for a change of venue made at a point in time much closer to the event which precipitated the supposedly prejudicial news coverage. It is also important to note that among the authorities cited in support of the conclusion reached by the Court was the opinion of a Judge who concurred in the decision of *Yount v Patton* (710 F2d 956, 978 [Garth, J., concurring]) which was reversed by the Supreme Court of the United States *(Patton v Yount,* 467 US 1025, *supra).*

For these reasons, we do not interpret the *Boudin* decision as having enacted a "bright line" rule which requires a change of venue whenever more than half of the prospective jurors reveal that their minds have been closed. The key is to

conduct a thorough screening process so that however many close-minded venirepersons there might be, the jurors ultimately selected have open minds. There will always be persons who have blind faith in what they read in the papers; however, there will fortunately always be others like the juror in this case who said "I've never drawn conclusions on the basis of what I read in the newspapers". There will always be people who form strong opinions based on a minimum of information; however, there will fortunately always be others who, even if possessed of a great amount of information, will wisely hold off judgment knowing that there may be more to learn. The key is to identify those persons who will make good jurors and those who will not. This is a task which can be accomplished anywhere, if enough care is taken, and we find that enough care was in fact taken by the Supreme Court in this case.

There was no "carnival atmosphere" at the defendant's second trial (cf., Sheppard v Maxwell, 384 US 333, 358). There was no "wave of public passion" sweeping over Suffolk County in 1990, at the time the defendant was tried for the second time (Irvin v Dowd, 366 US 717, 728, supra; see, Mu'Min v Virginia, 500 US 415, 428-429, supra; Patton v Yount, 467 US 1025, 1033, supra; People v Berkowitz, 93 Misc 2d 873, 879). Due to the exemplary precautions taken by the trial court, the defendant received as fair a trial as he would have received anywhere in this State. For these reasons, the defendant's primary contention on appeal is without merit.

■ The defendant also argues that the evidence, which he describes as circumstantial, was not sufficient to establish his guilt to a "moral certainty". We disagree.

The primary evidence of the defendant's guilt derives from the testimony of various witnesses who in July or August of 1979 heard the defendant make incriminating statements during the course of a casual conversation. These witnesses were, like the defendant himself, teenagers at the time this conversation took place. They recalled that the subject of the conversation turned to the then-recent Pius homicide and that the defendant was questioned about it. One of the parties to this conversation, who at the time of the trial was a police officer, testified as follows:

"Q After the discussion of the funeral mass took place, was Michael Quartararo asked a question?

"A Yes, he was, sir.

"Q What was he asked?

"A Danny Culotta asked him who killed Pius.

"Q And how did he respond?

"A He said, 'Ask Brensic'.

"Q Was he then asked another question?

"A Yes, he was.

"Q What was he asked?

"A Danny Culotta asked him, 'How could *you* kill someone for just stealing a motorbike?'

"Q And how did he respond to that, Michael Quartararo?

"A Michael Quartararo said, *'If you were drunk and stoned, and you didn't want to get caught, you would do the same thing.'*

"Q After he made that statement, did Michael Quartararo say anything else in your presence that you recall?

"A From my recollection, I recall that Michael had realized what he had said—

"[Defense Counsel]: Objection, your Honor.

"Q Not what he realized. Just tell us what he said.

"THE COURT: Sustained.

"A *Mike said Pius seen them steal the bike, the minibike. And he didn't touch the kid. All he did was put the bike against the tree.*"

"Q And that's what he said to you?

"A That's what he said, yes" (emphasis supplied).

A second party to the conversation recalled its substance as follows:

"Q Do you remember what Michael Quartararo said in response to a question being asked of him?

"A Yes.

"Q What did he say?

"A He said he felt sorry for what had happened. He also mentioned putting John's bike against the tree while those guys beat him up.

"Q Did he indicate to you where this took place?

"A Saint-Dogwood Elementary School.

"Q Did he indicate who he was with?

"A No.

"Q Meaning the other guys, who the other guys were?

"A No, he didn't.

"Q Do you remember him answering a question as to why it had taken place?

"A Yes.

"Q What did he say?

"A *If you were drunk enough and didn't want to get caught, you'd do the same thing'* " (emphasis supplied).

A third witness recalled the conversation as follows:

"Q After arriving there, did there come a time when a conversation took place about the death of John Pius and about the funeral of John Pius?

"A Yes.

"Q Now, after, or during that conversation I should say, did there come a time where you asked Michael Quartararo a question?

"A Yes.

"Q What did you ask him?

"A I asked him how *he* could kill a kid like that shoving rocks down his throat.

"Q And what did he say to you?

"A He said, *'If you were drunk and stoned and he saw you stealing a minibike you would do the same thing.'*

"Q Did Michael Quartararo indicate anything else about the murder of John Pius that night? Did he say anything else to you and the others about the murder of John Pius that night?

"A He said that *John Pius saw him putting the minibike in the back of Tommy Ryan's car"* (emphasis supplied).

A fourth witness testified as follows:

"Q Did there come a time, after arriving at the area of the St. James Railroad Station that night, that a conversation took place about the death of John Pius?

"A Yes, there did.

"Q And during that conversation did there come a point when Michael Quartararo was asked a question?

"A Yes.

"Q Do you remember what the question was?

"A Yes, I do.

"Q What was the question?

"A Danny had asked him, *'How could you kill someone for just stealing a minibike?'*

"Q And do you remember what Michael Quartararo said?

"A Yes. He said, '*If you were drunk and stoned and you didn't want to get caught, you would have done the same thing.*'

"Q Did he indicate anything else about the murder of John Pius?

"A Yes. Well, he talked a little bit after that. He said that *he had seen John Pius in the Dogwood area that night when they had possession of the minibike.*

"Q Did he indicate who they were, who he was with?

"A Yes he was with his brother Peter, Robert Brensic and Thomas Ryan.

"Q Did he indicate anything as to what Johnny Pius had seen?

"[Defense Counsel]: Objection

"A I think he just said —

"[Defense Counsel]: Excuse me.

"[The Prosecutor]: I'll rephrase the question, Judge.

"Q Did he indicate anything else as to Johnny Pius?

"A The only thing he said was *that he had seen him with the minibike*" (emphasis supplied).

A fifth witness recalled the conversation as follows:

"Q At some point while you were there that night, did there come a time when a conversation began about the death of a boy by the name of Johnny Pius?

"A Yes, there was.

"Q And at some point after the conversation began, did there come a time when Michael Quartararo said something about the death of Johnny Pius?

"A Yes, he did.

"Q Can you tell us what you recall Michael Quartararo saying?

"A He said that *they were stealing a minibike.* And that this boy John had seen them stealing the minibike. And that they were going to—*that he was going to call the police. Then they chased after him and caught up to him. And they had stepped on him, beat him up, punched him and kicked him.*

"Q Did they—I'm sorry. Go ahead.

"A And then he said that *he took the bike and put it some place*" (emphasis supplied).

The evidence produced by the People also included proof of a second conversation between the defendant and his friends

in September 1979. One witness recalled the substance of this conversation as follows:

"Q And during that conversation, do you recall Michael Quartararo being asked something?

"A Yes.

"Q What was that?

"A Something pertaining to, 'What's happening to you?,' as far as, 'What's going on with you?'

"Q And what did Michael Quartararo say?

"A He said that the cops had fucked up and that *he probably would get off*" (emphasis supplied).

A second witness recalled the conversation as follows:

"Q Can you tell us the conversation that you had with Michael, and what Michael Quartararo said?

"A The conversation, what I remember of the conversation, is Michael said that the Homicide detectives had shown him photos of Pius. And that his face, his nose was smashed off and that he was covered with leaves. In addition, Mike had said that—I asked him, I said, 'Well, are you in anymore trouble with this Pius case?' And he said *'The pigs fucked it up and too much time had passed'* (emphasis supplied).

A third witness recalled the conversation as follows:

"Q And did there come a time where a question was asked of Michael Quartararo?

"A Yes. Somebody asked Michael, 'Are you still in trouble with the police?' And he said, 'No. *It's too late.* The cops fucked it up. *The pigs fucked it up. They'll never catch us.'* " (Emphasis supplied.)

The defendant claims that the foregoing statements do not constitute "direct" evidence of guilt *(e.g., People v Sanchez,* 61 NY2d 1022). The People assert that they do constitute direct evidence *(e.g., People v Licitra,* 47 NY2d 554; *People v Rumble,* 45 NY2d 879, 881; *People v Basir,* 179 AD2d 662; *People v Medina,* 120 AD2d 749, 750). We need not decide how this evidence ought to be characterized and may assume that the stricter "moral certainty" burden of proof applies in this case, as was in fact charged by the trial court. This is so because whether it is measured against the "reasonable doubt" or against the "moral certainty" standard, the evidence was legally and factually sufficient to convict.

Given the number of witnesses who testified, there can be no doubt that the defendant made the statements attributed

to him. The defendant argues that he did not mean what he said and that "the statements could easily have been said sarcastically". He suggests that the statements might have constituted "the false bragging of a fourteen year old boy responding to the 'tough guy' reputation that the community had given him". He also argues that the statements "could simply be interpreted as 'nonsense' ".

The basic flaw in the defendant's "hypothesis of innocence" is that his incriminating statements were made during the course of two entirely different conversations which took place several weeks apart. The three witnesses to the later conversation were among the five witnesses to the earlier one. These were not strangers, whom an insecure 14 year old might attempt to impress by claiming to be a "tough guy". These were the defendant's friends. It might be plausible to suggest that an innocent youngster, confident that he is free of suspicion, might, on one occasion and perhaps while overpowered by alcohol, boast of a crime in which he had no part. But it becomes highly implausible to suggest that a teenager, who in fact knows that he is under suspicion for a heinous crime, would make such boasts repeatedly. We cannot fault the jury for rejecting a "hypothesis of innocence" which is so totally at odds with any normal understanding of human nature.

Viewing the evidence in the light most favorable to the prosecution *(see, People v Contes,* 60 NY2d 620), we find that it is legally sufficient to establish the defendant's guilt beyond a reasonable doubt. Moreover, upon the exercise of our factual review power, we are satisfied that the verdict of guilt is not against the weight of the evidence (CPL 470.15 [5]).

We have examined the defendant's remaining contentions, including those raised in his supplemental *pro se* brief, and find them to be without merit.

Accordingly, the judgment appealed from is affirmed.

JOY, HART and FRIEDMANN, JJ., concur.

Ordered that the judgment is affirmed.