**Michael QUARTARARO, Petitioner–Appellee–Cross–Appellant,**

v.

**Robert HANSLMAIER, Superintendent, Woodbourne Correctional Facility, Respondent–Appellant–Cross–Appellee.**

**Docket No. 98–3745**

United States Court of Appeals, Second Circuit.

Argued: Feb. 10, 1999

Decided: July 21, 1999

Mark D. Cohen, Chief Assistant District Attorney, Riverhead, N.Y. (James M. Catterson, Jr., District Attorney of Suffolk County, Steven A. Hovani, Michael J. Miller, Glenn Green, Assistant District Attorneys, of counsel), for Respondent–Appellant–Cross–Appellee.

Henriette D. Hoffman, The Legal Aid Society, Federal Defender Division, New York, New York, for Petitioner–Appellee–Cross–Appellant.

Before: VAN GRAAFEILAND, PARKER, Circuit Judges, and MISHLER, District Judge.*

Judge MISHLER concurs in the result.

VAN GRAAFEILAND, Circuit Judge:

■ Robert Hanslmaier, Superintendent of New York State's Woodbourne Correctional Facility, appeals from a judgment of the United States District Court for the Eastern District of New York granting petitioner Michael Quartararo's writ of habeas corpus. The district court granted the writ on the ground that the evidence at trial was legally insufficient to establish beyond a reasonable doubt petitioner's guilt of murder in the second degree. Quartararo also challenges the district court's finding that the trial testimony of a prosecution witness did not violate Quartararo's constitutional rights under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Our opinion presumes familiarity with the district court's opinion. *Quartararo v. Hanslmaier*, 28 F.Supp.2d 749 (E.D.N.Y.1998); *see also People v. Quartararo*, 200 A.D.2d

* The Honorable Jacob Mishler, of the United States District Court for the Eastern District

160, 612 N.Y.S.2d 635 (2d Dep't 1994). We review the district court's findings *de novo*. *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir.1996).

On April 20, 1979 John Pius, a thirteen-year-old boy, was heinously murdered by being trampled upon and beaten throughout his entire body, by having his mouth and throat plugged with stones and by then being buried and abandoned under leaves and debris, his status as a live boy or corpse being unknown at that time. A Suffolk County Grand Jury indicted four young men, petitioner Michael Quartararo, his brother Peter Quartararo, Robert Brensic and Thomas Ryan, charging them with complicity in the crime of murder in the second degree, Penal Law § 125.25.

The charge against Michael was that he, "acting in concert with and aided by the [other three defendants] with intent to cause the death of John Pius, caused his death by beating, kicking and shoving rocks in his mouth and throat." John Pius, a thirteen-year-old boy, was 5 feet 4 inches tall and weighed 116 pounds. The physician who performed the autopsy on him described his findings as follows.

A John Pius presents multiple contusions and lacerations of the forehead, to the right of the midline. He had marked edema, congestion and hemorrhage of both eyes. He had petechial hemorrhage—

Q Doctor, let me stop you for a moment. I'm going to jump in every so often if I can.

A Yes.

Q You said there was edema to the eyes?

A Yes, sir.

Q What is that?

A This is accumulation of fluid under the skin.

of New York, sitting by designation.

Q And I think you said petechial hemorrhage?

A Petechial hemorrhage.

Q In the eyes.

A Yes.

Q What is that?

A These are pinpoint hemorrhages due to a breaking of small blood vessels.

Q And that's also petechial hemorrhages?

A Yes, petechial hemorrhages

Q Is that also pinpoint hemorrhages?

A Yes.

Q What causes, in particular, petechial or pinpoint hemorrhages?

A In cases of asphyxia they are present.

Q In cases of asphyxia?

A Yes.

Q Were there any other injuries to the eyes?

A No, sir.

Q What else?

A There was a hemorrhage of the nose. There was marked edema and congestion of both lips. There was hemorrhage of the gums. There was a breaking of one tooth. There was a stone rock in the mouth. There was marked edema, congestion and hemorrhage of the right side of the face. There was multiple contusions and lacerations of the neck, anteriorally, laterally, and in back of both ears there was marked contusions and lacerations. There were marked contusions and lacerations of the chest, of the right shoulder anteriorally and on top of the right shoulder, on the right clavicle area. There were also other areas to the right of the umbilicals, on the right costal margin and the waistline, on both thighs, both knees, both ankles and both hands. Also in the back there were numerous superficial lacerations. These in a parallel pattern, parallel to another, and another crossing, that they extended from the mid-part of the back to both buttochs [sic]. And there were three points of pressure on the back. One in each scapula area and one in the lower part of the midline.

Q Okay. If I can just go back for a moment. You said that as far as the abdomen is concerned, what did you find?

A Contusions and lacerations.

Q And you also mentioned the hips?

A And both hips.

Q Also contusions and lacerations?

A Yes, sir.

Q And the hands as well?

A The hands too.

Q And what about the knees?

A In both knees too.

Q Again, abrasions, contusions?

A Contusions, abrasions.

John Pius was not struck by a train or run over by a truck. In view of the above described, personally inflicted injuries, there can be little doubt about the existence of an intent to cause death.

The trial court correctly instructed the jury concerning the prosecution's burden of proving Michael's guilt beyond a reasonable doubt. The court then added the admonition customarily used in New York State where proof consists solely of circumstantial evidence, that the evidence must "exclude to a moral certainty every other reasonable hypothesis, supposition or proposition except that of guilt of the accused." Because the proof of Michael's guilt did not consist solely of circumstantial evidence, application of the rigorous "moral certainty" test appears to have been unnecessary under New York law. *See People v. Rumble*, 45 N.Y.2d 879, 881, 410 N.Y.S.2d 806, 383 N.E.2d 108 (1978) (mem.), *People v. Basir*, 179 A.D.2d 662, 663, 578 N.Y.S.2d 603 (1992)(mem.).

The testimony against Michael is quoted at length in the opinion of the Appellate Division, Second Department, affirming his second conviction, *See People v. Quartara-*

*ro, supra,* at 167–71, 612 N.Y.S.2d 635. Despite the district court's efforts during the three-year period that the habeas corpus motion was before it to find differences in the testimony given at Michael's two trials, we find none of any significance. Moreover, the minuscule differences between the testimony of the witnesses at the two trials were not disclosed to the jury and argued as grounds for acquittal. Had they been disclosed, they might well have impressed the jury with the fact that the testimony had not been rehearsed. *See United States v. Ebeling,* 146 F.2d 254, 256 (2d Cir.1944). Instead of following the well-outlined path that a federal habeas corpus court must follow, the district court assumed for itself the position of a thirteenth juror.

■ Because we do not wish to unduly prolong this opinion, we discuss only a few of the district court's observations that we deem unmeritorious. The only items which the law enforcement representatives found at the scene were a ring, a pair of rusty scissors, a cough drop, cigarette butts and a book of matches. The district court stated that "all of the physical evidence was exculpatory." 28 F.Supp.2d at 769. "Exculpatory" means "clearing or tending to clear from alleged fault or guilt; excusing." BLACK'S LAW DICTIONARY 675 (Rev'd 4th ed.1968). Where, as here, a murder takes place in an empty field traversed by scores of people before the arrival of police experts, it is not surprising that fingerprints, tufts of hair, etc., were not discovered. Certainly, such physical evidence as was found should not be viewed by a habeas judge as "exculpatory." Moreover, the district court assumed that the jury credited defense witness Debra Dietrich's testimony that she did not see "any soil or dirt" on petitioner's clothes when he returned to the Quartararo home, and that it then drew the inference that no soil or dirt was on the clothes. The jury was under no obligation to credit the testimony or, if it did, to draw this next inference. Nor, if it did reach those conclu-

sions, was the jury required to view this evidence as exculpatory.

■ The district court attempted to disassociate Michael from Brensic's false statement to the police that the four defendants were at a high school watching a non-existent baseball game when the killing took place. The district court observed that Michael's acknowledgment to the police of his agreement with Brensic's statement "is extraordinarily weak." *Id.* at 771. We disagree. The jury clearly was entitled to infer a consciousness of guilt from Michael's conduct which had independent probative force. *See United States v. Anglin,* 169 F.3d 154, 160 (2d Cir.1999); *United States v. Jenkins,* 496 F.2d 57, 66 (2d Cir.1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975); *Mikus v. United States,* 433 F.2d 719, 728 (2d Cir.1970).

Statements made by petitioner to a group of his friends during a chin session in the summer of 1979 are more direct evidence of his guilt. This testimony is quoted at length in the opinions of both the New York Appellate Division, 200 A.D.2d 160, 167–71, 612 N.Y.S.2d 635, and the district court, 28 F.Supp.2d 749, 757–60. For our purposes, the following excerpt from the testimony of David O'Brien, one of the young men in attendance, will suffice.

> He said that they were stealing a minibike. And that this boy John had seen them stealing the minibike. And that they were going to—that he was going to call the police. Then they chased after him and caught up to him. And they had stepped on him, beat him up, punched him and kicked him.

Because O'Brien was quoting the language of a third party, the jury readily could infer that "they" included Michael Quartararo. As is clear from the summation of counsel, the correct interpretation of the word "they" included Michael. It is surprising, therefore, that the district court elected to state that, the evidence "is

unclear as to whether 'they' included Petitioner or not." 28 F.Supp.2d at 772.

In view of the fact that in this habeas proceeding all the evidence must be viewed in the light most favorable to the prosecution, *see Wright v. West,* 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992), *Green v. Abrams,* 984 F.2d 41, 44 (2d Cir.1993), the district court's statement that "[t]he fact that young boys were drinking *could* affect their recall of the words spoken, their memories of the events, and their perception of the conversation," (emphasis supplied) puts the proverbial shoe on the wrong foot. 28 F.Supp.2d at 772. This is not viewing the evidence in the light most favorable to the prosecution. Neither is the district court's statement that " '[a]dmissions are easily fabricated or imagined.' " 28 F.Supp.2d at 774 (quoting *Gangi v. Fradus,* 227 N.Y. 452, 458, 125 N.E. 677 (1920)). The evidence shows that, although some of the young men with whom petitioner talked had drunk some beer, one of them testified that he had drunk nothing and his testimony was corroborative of the other's. Notably, no witness testified that anyone appeared intoxicated or that alcohol affected his own perception or memory.

▪ Equally questionable is the district court's finding that there were "inconsistencies" in the testimony of the witnesses with whom Michael spoke because some testified at greater length and in greater detail than did others, and that these "inconsistencies" detracted from the reliability of the reports of Michael's statements. *Id.* at 772. We do not consider these asserted inconsistencies to be remarkable. At any rate, inconsistencies were for the jury to resolve. *See Herrera v. Collins,* 506 U.S. 390, 401, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993).

We also believe that the district court erred in observing that the five boys to whom petitioner made his first inculpatory statements did not come forward earlier because "none of the participants in the conversation believed the statements to be significant enough to report to either the police or their parents." 28 F.Supp.2d at 774. John McCort *did* report the incident, and it strikes us as quibbling to ignore this fact because he did not report "to either the police or [his] parents." David O'Brien and Michael Burke never were asked why they did not come forward sooner. James Burke testified that he did not come forward because he was afraid that petitioner and the others would harm him. Daniel Culotta testified that he did not come forward because "it was in the newspapers and everything" and because "I didn't get along with the police at that time."

The district court's dismissal of a second conversation between Michael and his friends, which took place several weeks after the first, is equally troublesome. There, Michael was asked whether he still was in trouble with the police in the Pius case. His response was "No, it's too late. The cops fucked it up. The pigs fucked it up. They'll never catch us." The district court stated that "[t]he 'Pius case' could have referred to a number of incidents other than the murder, including the theft of the minibike, the driving around and drinking with the others, his knowledge that Peter had confessed, the rampant rumors in the community, et cetera." *Id.* at 776. This contention conceivably might have been argued to a jury. It is not a stellar illustration of viewing the evidence in the light most favorable to the prosecution. Neither is the district court's observation that "[t]he statement that 'the pigs fucked up' has no evidentiary significance at all." *Id.*

The district court does not appear to have considered the combined inculpatory effect of the statements petitioner made on the two separate occasions. Whatever inculpatory effect statements have when examined separately is greatly magnified when the statements are viewed together. *Cf. Quartararo,* 200 A.D.2d at 172, 612 N.Y.S.2d 635 ("The basic flaw in the defendant's 'hypothesis of innocence' is that his

incriminating statements were made during the course of two entirely different conversations which took place several weeks apart.... [I]t becomes highly implausible to suggest that [an innocent] teenager, who in fact knows that he is under suspicion for a heinous crime, would make such boasts repeatedly. We cannot fault the jury for rejecting a 'hypothesis of innocence' which is so totally at odds with any normal understanding of human nature.")

■ The law governing habeas relief from a state conviction is too well established to require extensive review. It may be summarized briefly as follows: "Federal courts are not forums in which to relitigate state trials." *Herrera*, 506 U.S. at 401, 113 S.Ct. 853 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983)). A federal court is not permitted "to make its own subjective determination of guilt or innocence." *Id.* at 402, 113 S.Ct. 853 (quoting *Jackson v. Virginia*, 443 U.S. 307, 320 n. 13, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 401, 113 S.Ct. 853 (quoting *Jackson*, 443 U.S. at 318–19, 99 S.Ct. 2781).

In *Wright v. West*, 505 U.S. 277, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992), Justice Thomas writing for a majority of the Court, said:

In *Jackson*, we emphasized repeatedly the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review. We said that " '*all of the evidence*' is to be considered in the light most favorable to the prosecution," 443 U.S. at 319, 99 S.Ct. 2781 (emphasis in original); that the prosecution need not affirmatively "rule out every hypothesis except that of guilt" *id.*, at 326, 99 S.Ct. 2781; and that a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution," *ibid.*

*Id.* at 296–97, 112 S.Ct. 2482.

■ A federal court must look to state law to determine the elements of the crime. *Green v. Abrams*, 984 F.2d at 44–45. Moreover, "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990)). In view of the expressed intent of Michael and his colleagues to prevent Pius from informing the police about the theft of a minibike, *see* 200 A.D.2d 160, 170, 612 N.Y.S.2d 635, a jury reasonably could believe that they intended to silence him permanently, as they did, by killing him. *See Maldonado v. Scully*, 86 F.3d 32, 34–36 (2d Cir.1996); *People v. Cicchetti*, 44 N.Y.2d 803, 804–05, 406 N.Y.S.2d 285, 377 N.E.2d 739 (1978)(mem.); *People v. Horton*, 18 N.Y.2d 355, 359, 275 N.Y.S.2d 377, 221 N.E.2d 909 (1966). Evidence that Michael acted in concert with others was sufficient to warrant his conviction. *See People v. Rivera*, 84 N.Y.2d 766, 768, 622 N.Y.S.2d 671, 646 N.E.2d 1098 (1995). The New York Appellate Division, whom we may assume to be knowledgeable in the field of New York law, held that the evidence presented at trial was sufficient to support petitioner's conviction. We agree.

■ Despite the district court's rejection of petitioner's claim that he was denied the right of confrontation, petitioner argues at length that a denial existed which required that the writ be granted. Like the district court, we disagree.

Petitioner's claim is based upon the following two statements made by him to Detective Palumbo after petitioner's brother Peter already had been questioned by Palumbo:

All I did was drive around with them that night drinking beer.

You cops don't have anything on me. All I did was drive around with them drinking beer and I helped them steal the minibike. The only thing you got me for is stealing a minibike, not killing John Pius.

For statements such as these to make sense, they should be placed in context. *See United States v. Castro*, 813 F.2d 571, 576 (2d Cir.1987) ("[C]ourts historically have required a party offering testimony as to an utterance to present fairly the 'substance or effect' and context of the statement."); *see also United States v. Stratton*, 779 F.2d 820, 830 (2d Cir.1985); *United States v. Murray*, 618 F.2d 892, 900 (2d Cir.1980); *United States v. Gutier-rez–Chavez*, 842 F.2d 77, 81 (5th Cir.1988); *United States v. Jordan*, 810 F.2d 262, 264 (D.C.Cir.1987). To avoid any implication that an accusation by Peter was the context in which these statements were made, the prosecutor questioned Palumbo as follows:

Q  After you advised [Michael and his mother] of their rights, and after they gave the answers that you indicated, was Michael taken out of the room?  Just yes or no.

A  Yes, he was.

Q  Sometime after he was taken out of the room, did you bring him back into the room?

A  Yes, I did.

Q  After he was brought back in to the room, did you then say something to him?  Just yes or no.  Did you say something to him?

A  Yes, I did.

Q  As a result of what you said to him, did Michael Quartararo say something?

A  Yes, he did.

Q  What did he say?

A  "I don't know what you're talking about."

Q  After he said that, was something else said to him in the room?  Yes or no.

A  Yes, there was.

Q  And as a result of what was said to him, did he then say something?

A  Yes, he did.

Q  What did he say?

A  He said, "All I did was drive around with them that night drinking beer."

Q  After that was something else again said to him?  Just yes or no.

A  Yes, sir.

Q  And after that was said to him, did he say something else in response to that?

A  Yes, he did.

Q  What did he say?

A  He said, "You cops don't have anything on me.  All I did was drive around with them drinking beer and I helped them steal the minibike."  He said, "The only thing you got me for is stealing a minibike, not killing John Pius."

The district court held that Palumbo's testimony that he said "something" to petitioner was inadmissable hearsay and should have been excluded. 28 F.Supp.2d at 764. We disagree. " 'Hearsay' is a statement offered in evidence to prove the truth of the matter asserted." Fed. R.Evid. 801(c). " 'An inquiry is not an "assertion," and accordingly is not and cannot be a hearsay statement.' " *United States v. Oguns*, 921 F.2d 442, 449 (2d Cir.1990) (quoting *Inc. Pub. Corp. v. Manhattan Magazine, Inc.*, 616 F.Supp. 370, 388 (S.D.N.Y.1985), *aff'd*, 788 F.2d 3 (2d Cir.1986)); *see also United States v. Lewis*, 902 F.2d 1176, 1179 (5th Cir.1990); *United States v. Vest*, 842 F.2d 1319, 1330 (1st Cir.).

■  We do agree, however, with the district court's holding that Palumbo's statements were not of constitutional significance.  In the words of the district court:

The central problem with Petitioner's argument is that the word "something," even in the context in which it was used here, is too vague to act as an implicit accusation by Peter, made via Palumbo, that Petitioner was involved in the murder.

\* \* \* \* \* \*

[T]he jury would have had to engage in a lengthy reasoning process in order to conclude that the "something" that was said to Petitioner was the fact that Peter had confessed to the crime and had implicated Petitioner. The jury would have had to string together all of this testimony, conclude that Palumbo was merely acting as a conduit for Peter, and that the "something" was an accusation of Petitioner. This type of inferential reasoning is not the sort of direct and immediate confrontation that exists in any of the cases Petitioner cites in support of his position. The line of reasoning from "something" to an incriminating statement made by somebody who did not even testify is far too long and far too speculative to support the conclusion that Petitioner would like to reach.

28 F.Supp.2d at 765–66.

Unlike the case of *Mason v. Scully,* 16 F.3d 38 (2d Cir.1994), upon which petitioner places much reliance, this is not a case in which no police work turned up petitioner and the only lead to him came from Peter's conversation with Palumbo. *See id.* at 44.

The trial court charged the jury that it might not build an inference upon an inference. This correctly stated the jury's obligation.

In sum, we hold that the record does not justify the grant of habeas corpus relief. The order of the district court is reversed and the matter is remanded to the district court for disposition consistent with this opinion.

MISHLER, District Judge, concurring:

I concur in the result.