**Jane DOE, Plaintiff–Appellee,**

v.

**Francis D. PHILLIPS, II, Defendant,**

**Gerald D. D'Amelia, Jr., Defendant–Appellant.**

**No. 870, Docket 95–7659.**

United States Court of Appeals, Second Circuit.

Argued Jan. 19, 1996.

Decided April 22, 1996.

Robert N. Isseks, Middletown, New York (Alex Smith, Middletown, New York, on the brief), for Plaintiff–Appellee.

Phyllis A. Ingram, Nyack, New York (Harold Y. MacCartney, Jr., J. David MacCartney, Jr., MacCartney, MacCartney, Kerrigan & MacCartney, Nyack, New York, on the brief), for Defendant–Appellant.

Before: KEARSE, JACOBS, and HEANEY *, Circuit Judges.

Judge JACOBS dissents in a separate opinion.

KEARSE, Circuit Judge:

Defendant Gerald D. D'Amelia, Jr., an assistant district attorney for Orange County, New York, appeals from an order of the United States District Court for the Southern District of New York, Charles L. Brieant, *Judge,* denying his motion to dismiss the complaint of plaintiff Jane Doe, brought under 42 U.S.C. § 1983 (1994) for damages and declaratory relief on the ground that D'Amelia violated Doe's First Amendment rights by refusing to dismiss certain criminal charges against her unless she swore to her innocence on a bible in church. On appeal, D'Amelia contends principally that the district court should have granted his motion for summary judgment based on his defenses of absolute prosecutorial immunity and quali-

fied immunity. For the reasons that follow, we affirm the order of the district court.

## I. BACKGROUND

The facts relevant to this appeal do not appear to be in dispute. Doe and her estranged husband ("John Doe") have two sons. In October 1992, the older son, Nicholas, then age 14, lodged an official complaint, at the urging of his father, accusing Doe of engaging in acts of oral sex and sexual intercourse with Nicholas in September and October of that year. Doe was arrested in October 1992 and was charged with felony rape in the third degree, felony sodomy in the third degree, and the misdemeanor of endangering the welfare of a child. The case was assigned to D'Amelia.

After having several conversations with Nicholas and more than a dozen with John Doe, D'Amelia began, for several reasons, to doubt the reliability of the accusations. First, as to Nicholas's accounts of the abuse, D'Amelia "was concerned with some of the inconsistencies." (Deposition of Gerald D. D'Amelia, Jr. ("D'Amelia Dep.") at 20.) Another assistant district attorney who attended at least one of D'Amelia's interviews with Nicholas had even greater doubts than D'Amelia about Nicholas's credibility. (D'Amelia Dep. at 19–20.) In April 1993, D'Amelia filed a prosecutor's information, reducing the felony charges against Doe to misdemeanor counts of sexual abuse, all on dates different from the dates originally specified by Nicholas.

Second, D'Amelia had doubts about the credibility of John Doe with respect to the allegations of sexual abuse because, *inter alia,* John Doe "claimed that he was able to tell what was going to happen in the future sometimes through his dreams," and claimed that the FBI would verify that ability. (D'Amelia Dep. at 16.) D'Amelia was unable to locate the FBI agent named by John Doe and had "doubts about people predicting the future through dreams." (D'Amelia Dep. at 17.) D'Amelia also doubted John Doe's veracity because John Doe himself claimed to

---

* Honorable Gerald W. Heaney, of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

have witnessed one instance of Doe's alleged sexual abuse of Nicholas but had not contemporaneously complained. (*Id.*)

Further, D'Amelia stated that Nicholas himself "did not make an immediate [complaint] after the alleged abuse nor were his allegations volunteered. Rather, the child's allegations against his mother were made only after his father had had 'visions' that the child had been sexually abused by the mother"; and Nicholas's allegations were made only after "[t]he father had prodded his son in a car and in church for a total of about three hours." (D'Amelia unpaginated affidavit dated June 9, 1995 ("D'Amelia Aff."), Joint Appendix ("JA") 137.)

Doe maintained her innocence throughout. A Department of Social Services case worker conducted an investigation of the sexual abuse charges and attempted to determine whether or not the allegations were truthful. The social worker declined to validate the allegations. D'Amelia began to lack confidence that the charges against Doe could be proven beyond a reasonable doubt. (D'Amelia Dep. at 44.)

Toward the end of April 1993, John Doe proposed to D'Amelia that the charges be dismissed if Doe, a member of the congregation of a local Roman Catholic church (the "Church"), would place her hand on a bible in the Church and swear that she had not sexually abused her son. Threatening that he would not cooperate in the prosecution, John Doe stated "that he preferred that the matter be resolved by the law of God rather than the law of man." (D'Amelia Aff., JA 137.)

After consulting with several other assistant district attorneys, D'Amelia communicated this proposition to Doe's attorney. Doe, who continued to deny the charges against her, agreed to appear at the Church on May 7, 1993, because she wanted to have the criminal proceedings concluded. D'Amelia testified, however, that when they reached the Church on the morning of May 7, Doe's attorney indicated that Doe had

some reluctance to go through with what we had planned.

Q. And what you had planned was—

A. To have [Doe] deny the allegations by swearing on the bible that she never had any sexual contact with her son.

Q. In the church, correct?

A. Yes, in the church.

(D'Amelia Dep. at 55.) D'Amelia testified that he told counsel that Doe did not have to go through with this process, but that if she did not, the criminal charges against her would not be dismissed that day. Further, D'Amelia gave no indication that if Doe did not proceed to swear to her innocence on a bible in the Church, the charges would be dismissed at some subsequent time (D'Amelia Dep. at 53); rather, without discussing any other possibilities, D'Amelia suggested that "if this didn't happen on that day," Doe would be "going to trial where she may have been convicted or acquitted" (D'Amelia Dep. at 59).

Following this exchange, Doe and D'Amelia entered the Church and, in a small chapel area, proceeded with the ceremony. Also present were Doe's attorney, an investigator from the district attorney's office, John Doe, Nicholas, Doe's other son, who was three years younger than Nicholas, Doe's mother and sister, the Monsignor of the Church, and perhaps the assistant pastor as well. With D'Amelia holding the bible and reciting the oath that Doe was to repeat,

> [p]laintiff then placed her hand on [the] Bible and stated: "I, Jane Doe, swear on this Bible that I did not have any form of sexual contact with my son Nicholas on any occasion, so help me God,"

(D'Amelia Aff, JA 139).

Immediately thereafter, D'Amelia went to the local court in which the criminal charges were pending and had the charges dismissed. John Doe and Nicholas signed written forms consenting to the dismissal in consideration for Doe's oath in the Church; the forms stated that John Doe and Nicholas had "put [their] trust in the law of God, rather than the laws of man."

In September 1993, Doe commenced the present action against D'Amelia and Orange County District Attorney Francis D. Phillips II, alleging, *inter alia*, that D'Amelia's conduct constituted a coerced religious practice

in violation of the Establishment Clause of the First Amendment, and seeking damages and a declaratory judgment. The claim against Phillips was later withdrawn in light of evidence that he had had no personal involvement in the pertinent events.

Following discovery, D'Amelia moved to dismiss the claim against him for failure to state a claim on which relief could be granted, contending that Doe had voluntarily entered into the bargain for dismissal of the criminal charges in exchange for swearing to her innocence in the Church and hence could not claim that she had been coerced in violation of her constitutional rights. He moved alternatively for summary judgment, contending (a) that making the agreement for dismissal of the charges was a prosecutorial function, and he was thus entitled to absolute immunity, and (b) that since he had acted in good faith and believed after consultation with several of his colleagues that there was no problem in conditioning dismissal on a church ceremony, he was entitled to at least qualified immunity.

In a June 30, 1995 ruling from the bench, the district court denied D'Amelia's motions. Noting that it was "highly doubtful if a trier of fact could truly find voluntariness" in Doe's participation in the Church ceremony (Hearing Transcript, June 30, 1995 ("Tr."), 25), the court ruled that that question remained for trial on the merits of Doe's claim. The court denied D'Amelia's motion for summary judgment because it concluded as a matter of law that, on the facts before it, D'Amelia was not entitled to either absolute or qualified immunity.

The court rejected the claim of absolute immunity, reasoning that the compulsion of participation in a religious ceremony is not a prosecutorial function and is beyond a prosecutor's jurisdiction. The court noted that

as a matter of law ... the procedure [conducted by D'Amelia] was, in fact, religious, as it occurred in a Roman Catholic church by the direction of the prosecutor and the plaintiff was required to swear her innocence on the Bible pursuant to a[n] oath ending with the words: so help me God.

During the ceremony the pastor or priest was allegedly present standing in the back of the church and another clergyman may also have been present.

Tr. 21. The court stated that

as a matter of law ... a prosecutor does not have "any colorable claim of authority" ... to threaten continued prosecution of criminal charges unless a defendant submits to a prescribed religious ceremony to substantiate her contention that she's innocent.

Tr. 20.

The district court also rejected D'Amelia's theory that he was entitled to qualified immunity on the basis of his consultation with several other assistant district attorneys in his office, none of whom saw the proposed ceremony as an inappropriate condition. Noting that "in a wide range of contexts the Supreme Court has consistently prohibited government coercion of religious actions and speech, particularly speech in connection with religious belief," Tr. 23, the district court concluded that "any reasonable person, particularly any reasonable prosecutor trained as a lawyer, would be fully aware of the right of a citizen to be free from governmental coercion of religious exercise," Tr. 22–23. Thus, while Doe had not been able to point to a case similar to the present one, the court reasoned that it was "absolutely clear on this record that the allegedly compelled speech in this case was religious, and ... that no reasonable official could believe for one moment that forcing an individual to engage in a religious ceremony in a church comports with the First Amendment." Tr. 24.

D'Amelia's motion for summary judgment was thus denied, and this appeal followed. *See generally Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985) (district court's denial of a defense of qualified immunity, to the extent that it turns on an issue of law, is immediately appealable); *Nixon v. Fitzgerald*, 457 U.S. 731, 743, 102 S.Ct. 2690, 2697, 73 L.Ed.2d 349 (1982) (same re absolute immunity).

## II. DISCUSSION

On appeal, D'Amelia contends that the district court misapplied the standards govern-

ing absolute and qualified immunity. We disagree.

A. *Absolute Immunity*

In support of his defense of absolute immunity, D'Amelia argues principally that the dismissal of the charges against Doe in exchange for her participation in church proceedings fell squarely within the scope of his prosecutorial duties. We disagree.

It is of course well established that, although § 1983 does not on its face preserve traditional common-law immunities, "Congress did not intend § 1983 to abrogate immunities well grounded in history and reason." *Buckley v. Fitzsimmons,* 509 U.S. 259, 268, 113 S.Ct. 2606, 2612–13, 125 L.Ed.2d 209 (1993) (internal quotation marks omitted). These traditional common-law immunities include a prosecutor's absolute immunity from claims for damages arising out of prosecutorial duties that are "intimately associated with the judicial phase of the criminal process." *Imbler .v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976). While absolute immunity may "leave the genuinely wronged ... without civil redress against a prosecutor whose malicious or dishonest action" has deprived them of their constitutional rights, *Imbler,* 424 U.S. at 427, 96 S.Ct. at 993, considerations such as the need "to preserve the integrity of the judicial process" and to allow "a. public prosecutor ... zealously [to] perform the prosecutorial duties of the office," *Hill v. City of New York,* 45 F.3d 653, 656 (2d Cir.1995), require that the prosecutor be shielded from liability for damages with respect to acts performed within the scope of his duties when pursuing a criminal prosecution.

■ In determining whether a prosecutor enjoys absolute immunity against any particular claim for damages, the courts are to apply a "functional approach," examining "the nature of the function performed, not the identity of the actor who performed it." *Buckley v. Fitzsimmons,* 509 U.S. at 269, 113 S.Ct. at 2613 (internal quotation marks omitted). Thus, "the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." *Id.* at 273, 113 S.Ct. at 2615. We are to inquire whether those actions are part of a prosecutor's traditional functions, *see, e.g., Pinaud v. County of Suffolk,* 52 F.3d 1139, 1147–48 (2d Cir. 1995); *Hill v. City of New York,* 45 F.3d at 661–62, and "whether [they] are closely associated with the judicial process," *Burns v. Reed,* 500 U.S. 478, 495, 111 S.Ct. 1934, 1944, 114 L.Ed.2d 547 (1991). The ultimate "question ... is whether the prosecutors have carried their burden of establishing that they were functioning as 'advocates' when they" engaged in the challenged conduct. *Buckley v. Fitzsimmons,* 509 U.S. at 273, 113 S.Ct. at 2616. If the challenged conduct either is not a traditional function of a prosecutor, *see, e.g., id.* at 275–78, 113 S.Ct. at 2617–18 (holding press conference not a prosecutorial function), or is not part of his adversarial function, *see, e.g., Burns v. Reed,* 500 U.S. at 495–96, 111 S.Ct. at 1944–45 (for example, advising police on permissibility of investigatory .method), the prosecutor is not entitled to absolute immunity. An official also has no absolute immunity when he has acted in the "clear absence of all jurisdiction." *Stump v. Sparkman,* 435 U.S. 349, 357, 98 S.Ct. 1099, 1105, 55 L.Ed.2d 331 (1978) (internal quotation marks omitted).

■ Within this framework, a prosecutor has absolute immunity from a claim for damages for commencing a prosecution, *see, e.g., Imbler v. Pachtman,* 424 U.S. at 431, 96 S.Ct. at 995 (prosecutor absolutely immune from damages for "initiating a prosecution"); *Barr v. Abrams,* 810 F.2d 358, 362 (2d Cir. 1987) (absolute immunity extends to filing criminal information and procuring arrest warrant), as well as for his performance of tasks as an advocate in the conduct of the prosecution, *see, e.g., Dory v. Ryan,* 25 F.3d 81, 83 (2d Cir.1994) (prosecutor absolutely immune from liability on damages claim that he conspired to present false evidence at criminal trial). Further, since the prosecution-initiation decision with respect to any given charge is an either-or proposition, we have recognized that a prosecutor will be absolutely immune from a claim for damages for a decision not to prosecute. *See, e.g., Schloss v. Bouse,* 876 F.2d 287, 290–91 (2d Cir.1989) (discussed below); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 531 (2d

Cir.1993) (prosecutor absolutely immune for deciding not to institute criminal proceeding and thus advising police not to arrest suspect on charges).

Using the required functional approach, we have also recognized that absolute immunity extends to a prosecutor's agreement to forgo prosecution in exchange for certain types of concessions by the accused. In *Taylor v. Kavanagh,* 640 F.2d 450, 453 (2d Cir.1981), for example, the plaintiff brought a suit for damages on the ground that in a prior criminal proceeding the prosecutor had misrepresented facts to him, inducing him to plead guilty to certain charges; we ruled that the prosecutor had absolute immunity because his conduct involved plea bargaining, a prosecutorial function. In *Schloss v. Bouse,* 876 F.2d at 292–93, the plaintiffs sought damages because a prosecutor required them, following their arrest, to execute releases in favor of various municipal entities in order to obtain his agreement not to prosecute. Noting that "the demand for releases and the threat to prosecute were interdependent," *id.* at 291, we concluded that the prosecutor must be understood to have made a prosecutorial decision, albeit a conditional one, and that the demand for the releases was akin to a plea bargain. We held that absolute immunity attached to his actions, regardless of his motivation in securing the releases, because the negotiation of a plea bargain is an act within a prosecutor's jurisdiction as a judicial officer.

In so concluding, however, we emphasized that "we [we]re not confronted with a demand that [wa]s foreign to the prosecutor's office," *id.* at 292, and we expressly rejected any notion

> that the prosecutor may with impunity couple a threat of prosecution with all manner of demands, for example, demands for bribes or sexual favors. A government official does not have absolute immunity for acts that are "manifestly or palpably beyond his authority," ... or performed in the " 'clear absence of all jurisdiction,' "

*id.* at 291. We stated that, in order to determine whether a prosecutor has lost his shield of absolute immunity by making his prosecutorial decision conditional on the suspect's performing a demanded act, a court is to look to "the nature of the conduct that was allegedly intertwined with the prosecutorial decision ... and deny absolute immunity if the demand was plainly beyond the prosecutor's jurisdiction." *Id.* at 291–92. If the prosecutor has acted " 'without any colorable claim of authority' " to impose the condition in question, *id.* at 291 (quoting *Barr v. Abrams,* 810 F.2d at 361), his conduct is not protected by absolute immunity.

■ In the present case, the intertwined conduct was the demand for a religious oath on a bible in a church. It is well settled that a government official has no authority to require a religious act, for the Establishment Clause of the First Amendment, which is applicable to the states through the Fourteenth Amendment, *see People ex rel. McCollum v. Board of Education,* 333 U.S. 203, 210–11, 68 S.Ct. 461, 464–65, 92 L.Ed. 649 (1948), provides that "Congress shall make no law respecting an establishment of religion," U.S. Const. amend. I. Under the First Amendment, "[i]t is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to ... participate in religion or its exercise...." *Lee v. Weisman,* 505 U.S. 577, 587, 112 S.Ct. 2649, 2655, 120 L.Ed.2d 467 (1992).

> The First Amendment's Religion Clauses mean that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State. The design of the Constitution is that preservation and transmission of religious beliefs and worship is a responsibility and a choice committed to the private sphere, which itself is promised freedom to pursue that mission. It must not be forgotten then, that while concern must be given to define the protection granted to an objector or a dissenting nonbeliever, these same Clauses exist to protect religion from government interference.

*Id.* at 589, 112 S.Ct. at 2656. *See also Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968) ("The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion." (footnote omitted)); *see generally Lemon v. Kurtz-*

*man,* 403 U.S. 602, 613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) (Establishment Clause prohibits, *inter alia,* "an excessive government entanglement with religion" (internal quotation marks omitted)).

 Under these standards, the district court correctly ruled, given the undisputed facts and the facts to which D'Amelia himself attested, that D'Amelia's conduct was not protected by absolute immunity because his demand that Doe swear to her innocence on a bible in church was manifestly beyond his authority. We reject D'Amelia's contention that the May 7, 1993 ceremony to which Doe was subjected was analogous to the swearing of witnesses in judicial proceedings. In the latter, a witness's oath is recited in the presence of a secular authority in a generally nonreligious setting. Further, in a federal judicial proceeding, the witness always has the option of giving a nonreligious affirmation of her commitment to tell the truth rather than swearing on a bible or to a divine Being. *See, e.g.,* Fed.R.Civ.P. 43(d) (permitting affirmation instead of oath); Fed. R.Evid. 603 (same); Fed.R.Crim.P. 6(c) (giving grand jury foreperson power to administer oaths "and affirmations"); 28 U.S.C. § 1746 (1994) (generally permitting affirmations instead of oaths under federal law).

In contrast, it is plain that the May 7 swearing conducted by D'Amelia was a religious event. The proceeding took place in a church, with at least one priest present. D'Amelia required Doe to place her hand on a bible. And the oath, whose content was devised by D'Amelia, and which he required Doe to repeat after him, ended with the phrase "so help me God." The district court correctly ruled that in so doing, D'Amelia performed acts that not only are patently forbidden of government officials by the Constitution but also are distinctly outside the realm of a prosecutor.

The religious nature of the act demanded of Doe was emphasized by the impetus for the ceremony. John Doe informed D'Amelia that John Doe preferred to have the charges against Doe "resolved by the law of God rather than the law of man." (D'Amelia Aff., JA 137.) And in consenting to the dismissal of the charges, John Doe and Nicholas signed consent forms that stated that they had "put [their] trust in the law of God, rather than the laws of man." The district court properly ruled that D'Amelia had no colorable claim of jurisdiction *qua* prosecutor to enforce the laws not of man but of God.

B. *Qualified Immunity*

In support of his defense of qualified immunity, D'Amelia argues, *inter alia,* that he did not violate any clearly established constitutional rights because he and his colleagues knew of no case holding that requiring an accused to swear to her innocence on a bible in church was impermissible. We reject his contentions substantially for the reasons stated by the district court.

 Government officials may enjoy a privilege of qualified immunity from liability for damages arising out of their performance of discretionary official functions so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Ying Jing Gan v. City of New York,* 996 F.2d at 532–33. In order to be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). To determine whether a right was clearly defined at the time the defendant acted, a court should consider:

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Ying Jing Gan v. City of New York,* 996 F.2d at 532 (internal quotation marks omitted).

 The right of an individual not to be forced to participate in a religious ceremony was clearly established, as is demonstrated

by the authorities discussed in Part II.A. above. The district court correctly ruled that that right was so well established that "any reasonable person, particularly any reasonable prosecutor trained as a lawyer, would be fully aware of the right of a citizen to be free from governmental coercion of religious exercise," Tr. 22–23; that it was "absolutely clear on this record that the allegedly compelled speech in this case was religious[;] and . . . that no reasonable official could believe for one moment that forcing an individual to engage in a religious ceremony in a church comports with the First Amendment," Tr. 24.

■■■ Though D'Amelia contends that Doe was not in fact "forced" to swear to her innocence in the Church, and that she did so of her own volition, we, like the district court, are skeptical in light of D'Amelia's own deposition testimony. Even a "subtle coercive pressure" by a government official to engage in religious activity may violate the First Amendment, see Lee v. Weisman, 505 U.S. at 591, 112 S.Ct. at 2658, and D'Amelia's testimony reveals that the only alternatives he offered Doe were to swear on a bible in the Church or to have the criminal charges go to trial.

In any event, the question of whether Doe's submission to the religious ceremony was voluntary goes to the merits of her claim, not to D'Amelia's entitlement to immunity. The ultimate resolution of the voluntariness issue remains for the jury as trier of fact.

### CONCLUSION

We have considered all of D'Amelia's arguments on this appeal and have found them to be without merit. The order of the district court denying his motion for summary judgment dismissing the complaint on immunity grounds is affirmed.

JACOBS, Circuit Judge, concurring in part, dissenting in part:

I concur in the majority's discussion of qualified immunity in Part II.B of the opinion, but I respectfully dissent from the majority's decision in Part II.A to deny absolute immunity.

I agree with the majority that, in determining whether a prosecutor is entitled to absolute immunity, we must take a "functional approach" that examines whether the prosecutor's actions were "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976). Commencing a prosecution is one such prosecutorial function, *id.* at 424–25, 96 S.Ct. at 992–93, and, "as a matter of logic, absolute immunity must also protect the prosecutor from damages suits based on his decision *not* to prosecute." *Schloss v. Bouse*, 876 F.2d 287, 290 (2d Cir.1989). I recognize that absolute immunity does not extend to a prosecutor who, as a condition of dismissing charges, makes a demand on the defendant that "is foreign to the prosecutor's office." *Id.* at 292. The majority holds that the condition imposed here by D'Amelia—that Doe swear her innocence on a Bible in a church—is unprotected under the governing standards because it was "manifestly or palpably beyond his authority," *Spalding v. Vilas*, 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780 (1896), or performed in the "clear absence of all jurisdiction." *Stump v. Sparkman*, 435 U.S. 349, 357, 98 S.Ct. 1099, 1105, 55 L.Ed.2d 331 (1978) (internal quotation marks and citation omitted). I dissent from that holding because D'Amelia's demand (i) was intertwined with a prosecutorial decision (to prosecute or not) and (ii) entailed an act (the eliciting of a statement under oath on the subject of the prosecution) that was within D'Amelia's role and jurisdiction as a prosecutor. This is demonstrably sufficient to insulate D'Amelia from civil liability under the authorities that apply the doctrine of absolute immunity.

Whether a prosecutor's act is "foreign to the prosecutor's office" does not depend on the reprehensible, unethical or inappropriate elements of that act—even if that act allegedly violates the plaintiff's constitutional rights. Rather, "absolute immunity extends to those acts, whether in or out of the courtroom, 'which occur in the course of [the prosecutors's] role as an advocate for the State.'"

*Pinaud v. County of Suffolk,* 52 F.3d 1139, 1148 (2d Cir.1995) (quoting *Buckley v. Fitzsimmons,* 509 U.S. 259, 273, 113 S.Ct. 2606, 2615, 125 L.Ed.2d 209 (1993)). A prosecutor's wrongful act, such as participating in a conspiracy to manufacture evidence, "is certainly not something that is *properly* within the role of a prosecutor," but that "is immaterial, because [the] immunity attaches to his function, not to the manner in which he performed it." *Dory v. Ryan,* 25 F.3d 81, 83 (2d Cir.1994) (internal quotation marks and citation omitted). The absolute character of absolute immunity is that it "protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate." *Dory,* 25 F.3d at 83. In short, absolute immunity insulates prosecutorial misconduct—however outrageous—so long as the misconduct is *prosecutorial.*

We have taken the functional approach to the issue of immunity in various contexts. In *Dory,* a prosecutor who allegedly participated in a conspiracy to present false evidence at trial was held to be absolutely immune, 25 F.3d at 83, because the "professional evaluation of the evidence ... and appropriate preparation for its presentation at trial" are prosecutorial acts. *Buckley,* 509 U.S. at 271, 113 S.Ct. at 2615. *See also Brodnicki v. City of Omaha,* 75 F.3d 1261, 1267 (8th Cir.1996) (prosecutor who allegedly violated plaintiff's right to due process by examining evidence prior to trial and discussing charges with defense counsel was entitled to absolute immunity). Similarly, in *Pinaud* we granted absolute immunity to prosecutors who allegedly violated the plaintiff's rights under the Fourth, Fifth, Sixth and Eighth Amendments by: seeking improperly to increase the plaintiff's bail; making false representations to prompt a plea agreement, and then breaching that agreement; manufacturing a bail jumping charge; making misrepresentations to the Bureau of Prisons; and unnecessarily transferring the plaintiff from county to state jail. 52 F.3d at 1149. All of these alleged acts, while unethical, deviant, and violative of the plaintiffs' constitutional rights, were "components of the initiation and presentation of a prosecution, and therefore ... protected by absolute immunity." *Id.*

Courts allow absolute immunity even where the prosecutor allows the decision to prosecute to depend on conduct by the defendant that is, strictly speaking, not the prosecutor's business. In *Schloss,* the decision to forgo prosecution was made to depend upon the putative defendants' release from liability of the municipalities and police officers who allegedly arrested and detained them in violation of their constitutional rights. 876 F.2d at 289. We held that the prosecutor was entitled to absolute immunity because the demand on which the decision to prosecute depended was in the nature of a plea bargain, and plea bargains are not foreign to the office of a prosecutor. *Id.* at 291. *See also Taylor v. Kavanagh,* 640 F.2d 450, 453 (2d Cir.1981) ("a prosecutor's activities in the plea bargaining context merit the protection of absolute immunity"). Other circuits have granted absolute immunity to prosecutors in similar cases. *See Mendenhall v. Goldsmith,* 59 F.3d 685, 691 (7th Cir.) (prosecutor allegedly violated plaintiff's First, Fourth and Fifth Amendment rights by conditioning dismissal of civil forfeiture action upon plaintiff's agreement not to use real property for an "adult use"), *cert. denied,* —— U.S. ——, 116 S.Ct. 568, 133 L.Ed.2d 492 (1995); *Pfeiffer v. Hartford Fire Ins. Co.,* 929 F.2d 1484, 1492 (10th Cir.1991) (prosecutors allegedly violated plaintiff's constitutional rights by threatening to file criminal charges against plaintiff unless he stopped practicing medicine); *Arnold v. McClain,* 926 F.2d 963, 967 (10th Cir.1991) (prosecutor allegedly violated plaintiff's Fourth and Fifth Amendment rights by compelling him to resign from job to avoid a perjury charge); *McGruder v. Necaise,* 733 F.2d 1146, 1147–48 (5th Cir. 1984) (prosecutors allegedly violated plaintiff's right to " 'free and equal' access to the courts" by threatening to pursue criminal charges unless plaintiff dismissed civil action). In each of these cases, the alleged bad act was a perversion of the prosecutorial role; but each prosecutor was entitled to absolute immunity from civil liability because the role itself was prosecutorial. D'Amelia (whose conduct was in no way corrupt or immoral) should be protected in the same way for the same reason.

As in *Schloss,* D'Amelia's decision to forgo prosecution was made to depend upon a condition. That condition required Doe to give a statement under oath. The statement concerned the criminal charges then pending. The willingness of the complainants to cooperate further in the criminal proceedings depended on that statement. Eliciting such statements from a willing suspect in a pending criminal matter is not an activity foreign to the office of a prosecutor. *See Buckley,* 509 U.S. at 273, 113 S.Ct. at 2615 ("acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial" are entitled to absolute immunity). That is because "[p]reparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence," *Imbler,* 424 U.S. at 431 n. 33, 96 S.Ct. at 996 n. 33, including statements made by witnesses or alleged perpetrators. Therefore, in my view, we must grant D'Amelia absolute immunity because his conduct, while inappropriate, "occur[red] in the course of his role as an advocate for the State." *Buckley,* 509 U.S. at 273, 113 S.Ct. at 2615.

The majority opinion focuses on the impropriety of the prosecutor's conduct rather than on whether that improper conduct was intertwined with a prosecutorial function. The majority thus poses a question to which there can be one answer: Is compelling a defendant to participate in a "religious ceremony" a prosecutorial function? That inquiry, however, conflates a generic function of a prosecutor (taking a statement under oath) with the aspect of that conduct which is alleged to be unconstitutional (taking that statement in a church, on a Bible, etc.). That is not the approach we have employed in previous cases. In *Dory,* we did not ask whether suborning perjury was *"properly* within the role of a prosecutor"; we held that

that inquiry was "immaterial." 25 F.3d at 83. In *Pinaud,* we did not ask whether it was a prosecutorial function to dissemble and confect false charges. And in *Schloss,* we did not ask whether procuring releases from civil liability was a prosecutorial act. In each of these cases, we asked whether the underlying conduct was related to the prosecutorial function—and granted absolute immunity if it was, whether or not the misconduct was egregious. By focusing on the nature of the misconduct in this case, the majority opinion erroneously qualifies absolute immunity.[1]

Although prosecutors may set conditions for ending a prosecution—and enjoy absolute immunity in so doing—I agree with the majority that this freedom has its limits. Under *Schloss,* we determine those limits by looking to the "nature of the conduct that was allegedly intertwined" with the decision to prosecute or not, "and deny absolute immunity if the demand was plainly beyond the prosecutor's jurisdiction," *Schloss,* 876 F.2d at 291–92, or was "manifestly and palpably beyond his authority." *Spalding,* 161 U.S. at 498, 16 S.Ct. at 637. *Schloss* gives examples of misconduct that would be unsheltered by absolute immunity: a demand for a bribe or for sexual favors. 876 F.2d at 291. These acts of misconduct—which serve purely personal interests without an alloy of a public function—differ in kind from the misconduct that is protected by absolute immunity. There is a difference between performing one's office, however disgracefully, and offering to sell it for a purely personal benefit.[2]

The majority rests its decision on the proposition that a government prosecutor "has no authority to require a religious act." Maj. Op. at 1210. Under the Establishment Clause of the First Amendment, that is undoubtedly true. However, to characterize Doe's oath as a "religious act" begs the ques-

---

1. The majority opinion emphasizes that the oath in church is the subject of "undisputed facts ... to which D'Amelia himself attested...." Maj. Op. at 1211. But this makes no difference. Whether D'Amelia has attested to the act in question or not, we are bound to assume it at the summary judgment stage, as we do in other cases, because we look at the plaintiff's allegations in a light most favorable to her; but we should not strip D'Amelia of absolute immunity

because he attests to what we would otherwise be bound to assume.

2. A prosecutor who used his office to proselytize a particular religion could be viewed as obtaining a purely personal benefit. Here, however, the oath was taken in Doe's own church, at the suggestion of her spouse and son, and there is no indication that D'Amelia had or expressed the slightest sectarian preference.

tion of whether the act had a secular, prosecutorial purpose. The prosecutorial purpose here was to ascertain whether Doe committed the crime and whether the complainants would cooperate in the prosecution. In aid of that purpose, D'Amelia asked Doe to recite, "I, Jane Doe, swear on this Bible that I did not have any form of sexual contact with my son Nicholas on any occasion, so help me God." Similar statements are taken every day in federal and state courtrooms. As the majority stresses, a witness in federal court now has the option of averring as to the veracity of her testimony by a nonreligious affirmation. *See* Fed.R.Civ.P. 43(d); Fed. R.Evid. 603. But, conversely, an affiant may choose to swear on a Bible, and may end with the words "so help me God." The essence and definition of any oath is the invocation of God as witness. While that invocation inspires awe, a witness's oath is not thereby converted into a "religious act" or ritual that subsumes the secular purpose of the proceedings.

Naturally, religious feeling is heightened when an oath is taken in a church; but that does not keep the oath from serving the secular, prosecutorial function it fulfills in other settings. In *Knapp v. Leonardo*, 46 F.3d 170, 177 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2566, 132 L.Ed.2d 818 (1995), we affirmed the denial of a habeas petition filed by a defendant whose murder trial was conducted in a Catholic church hall while the Otsego County Courthouse was under repair. As the dissent pointed out, the premises contained " 'holy pictures' and other religious artifacts, including but not necessarily limited to a crucifix along the path from the makeshift courtroom to the jury room." *Id.* at 181 (Oakes, *J.,* dissenting). Although this Court emphasized that "it was undoubtedly imprudent" to conduct the trial there, we quoted the view of the state appellate court that "[e]ven traditional courtrooms are not devoid of religious symbols and artifacts and both jurors and witnesses are traditionally sworn with the phrase 'so help you God.'" *Id.* at 177 (quoting *People v. Knapp*, 113 A.D.2d 154, 159, 495 N.Y.S.2d 985, 989 (3d Dep't 1985), *cert. denied,* 479 U.S. 844, 107 S.Ct. 158, 93 L.Ed.2d 97 (1986)).

As the majority opinion points out, John and Nicholas Doe stated that they preferred to "put [their] trust in the law of God, rather than the laws of man" when they promised that they would not testify against Doe if she took the oath. Although the Establishment Clause prohibits government officials from compelling citizens to participate in religious exercises, I cannot agree with the majority that D'Amelia, in asking Doe to take the oath in the church, undertook to enforce "the laws not of man but of God" (a locution that may suggest there is no overlap). Maj. Op. at 1211. D'Amelia performed his prosecutorial role in an unusual manner, faced as he was by strange circumstances: a criminal charge that is difficult to corroborate; a domestic dispute, in which deference (often excessive deference) is given to the willingness of family members to cooperate; and complainants who were willing to withdraw a possibly delusional charge if their wife and mother took an oath in the family's church. D'Amelia had reason to think that that oath would fully serve the interests of the complainants, the defendant, the community and the prosecutorial office. As to Doe, D'Amelia's conduct spared her the kind of ordeal and humiliation that persons unjustly accused of child molestation routinely endure, and from which acquittal is often an ineffective deliverance. Because I believe that D'Amelia's actions were entwined with his functions as a prosecutor, I would hold that he is entitled to absolute immunity.