THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RICKY
A. KNAPP, Appellant.

Third Department, November 21, 1985

**APPEARANCES OF COUNSEL**

*John H. Owen* for appellant.

*Paul W. Elkan, District Attorney,* for respondent.

**OPINION OF THE COURT**

MAHONEY, P. J.

Defendant was indicted in January of 1978 and charged with two counts of second degree murder based on the death of Linda Jill Velzy, an 18-year-old co-ed attending the State University College at Oneonta. One count charged intentional murder (Penal Law § 125.25 [1]), alleging that defendant beat the victim to death. The other count charged depraved and reckless murder (Penal Law § 125.25 [2]), alleging that defendant abandoned the victim in an injured condition in a secluded area on a winter night and failed to transport her for medical care. After a trial, a jury acquitted defendant of intentional murder but convicted him of reckless murder. This court affirmed the conviction, holding that while a confession had been taken in violation of defendant's right to counsel and should have been suppressed, such error was harmless in light of the overwhelming evidence of guilt (82 AD2d 971). The Court of Appeals reversed, finding that certain other inculpatory statements and tangible evidence, as well as the confession, should have been suppressed. The Court of Appeals further found the error not to be harmless, and remitted the matter for further proceedings (57 NY2d 161, *cert denied* 462

US 1106). After a second trial on the second count of the indictment, a jury acquitted defendant of reckless murder but convicted him of the lesser included offense of second degree manslaughter. Defendant was thereafter sentenced, as a persistent felon, to an indeterminate term of imprisonment of 25 years to life. This appeal by defendant ensued.

■ Initially, defendant alleges as error this court's denial of two pretrial motions to change venue (CPL 230.20 [2]). Since this court has already ruled on this issue by denying the motions, the decisions are the law of the case and are not properly raised on appeal to this court. However, we will treat this issue as a contention that defendant was denied his constitutional right to a fair trial by an impartial jury by reason of extensive pretrial publicity, including coverage of his suppressed confession, the prior conviction and the reversal of the conviction on appeal.

■ An accused has a constitutional right to a fair trial by a panel of impartial jurors (Irvin v Dowd, 366 US 717, 722), and it has been recognized that "sensational" criminal trials may generate prejudicial publicity which threatens this right (see, Nebraska Press Assn. v Stuart, 427 US 539, 551-552). However, it is unrealistic to expect and require jurors to be totally ignorant prior to trial of the facts and issues in a case (see, Irvin v Dowd, supra; People v Genovese, 10 NY2d 478, 481). Thus, the United States Supreme Court has held that extensive knowledge in the community of the crime and the accused is not sufficient by itself to establish that a trial was unfair (Dobbert v Florida, 432 US 282, 303). In the instant case, the publicity surrounding the initial trial, the appellate proceedings and the retrial was extensive. Most significantly, the publicity involved confessions and other evidence which the Court of Appeals ordered suppressed upon the second trial. Nonetheless, the voir dire examination of the jurors was extensive and thorough and provided an opportunity to eliminate jurors who were aware of the suppressed evidence or who were otherwise unable to render an impartial verdict. While it appears that defendant did not take advantage of this opportunity, such decision was a matter of trial strategy. Upon review of the record, we are unable to conclude that the conviction was "obtained in a trial atmosphere that had been utterly corrupted by press coverage" (Murphy v Florida, 421 US 794, 798).

■ Defendant contends that the voir dire examination of the jurors was improperly conducted. County Court granted defen-

dant's request to individually examine the potential jurors *(see, People v Boulware,* 29 NY2d 135, *cert denied* 405 US 995), but refused to exclude the media and public while jurors were questioned regarding publicity. Defendant took the position that if jurors were questioned about whether they were aware of the confession and other prejudicial matters, the media would report the questioning, thus informing other potential jurors of these prejudicial matters. As a result, defendant's attorney limited his voir dire concerning publicity of prejudicial matters. This claim must be rejected since it is clear that the media was already aware of these prejudicial matters, had been reporting them throughout the history of this litigation and was free to continue to report them. Thus, the presence of the media at this stage of the voir dire did not prejudice defendant. We also find no merit to defendant's contention that County Court improperly described the concept of reasonable doubt to jurors during the voir dire. The explanation was not given as part of the jury charge, but simply to clear up a question by potential jurors. Moreover, it was not so incorrect as to have been prejudicial.

■ Next, defendant argues that he was denied a fair and public trial because, due to renovations being conducted at the Otsego County Courthouse, the trial was held in the church hall of a Roman Catholic church. The hall apparently had "holy pictures" and other religious artifacts, including a crucifix along the path from the makeshift courtroom to the jury room. Initially, we reject the contention that defendant was denied a public trial. While the church hall was a private building, nothing in the record indicates that public access was restricted during the trial. Moreover, it appears that the church hall was used for a number of secular purposes. More troublesome is the claim that the location of the trial denied defendant a fair trial. Both defendant and the People objected to the trial being held in the church hall. The Otsego County Office Building, where the voir dire of the jury was conducted, was not used for the trial. In *People v Rose* (82 Misc 2d 429, 431), it was held that "selection as a courthouse or courtroom of a building or room dedicated to religion or permeated with religious symbols is inconsistent with the spirit and intent of the constitutional prohibitions of and fortifications against establishment of religion". Thus, the church hall may not have been an ideal place for the trial. However, the question on appeal is whether the choice of the place of trial was so prejudicial as to have denied defendant a fair trial. We think

not. The effect of a religious environment and religious artifacts on jurors is uncertain. It is as likely that the jurors would be influenced to render a just and honest verdict as that they would somehow be prejudiced against defendant. Even traditional courtrooms are not devoid of religious symbols and artifacts and both jurors and witnesses are traditionally sworn with the phrase "so help you God". Thus, the legal conceptions of truth and justice are often related to the religious conceptions of these terms. Further, the trial was not held in a church, but in a church hall which was a separate building. While County Court did not allow defense counsel to develop the record fully regarding the number, description and location of religious artifacts, it does not appear from the record that the religious environment was so pervasive as to deny defendant a fair trial.

■ Defendant also argues that County Court improperly admitted evidence that he struck the victim. As discussed earlier, defendant had been charged with two counts of second degree murder: intentional murder based on allegations that he struck the victim and reckless murder based on his failure to transport her for medical care. At the first trial, the jury acquitted defendant of the intentional murder charge. At the second trial, the People presented the testimony of a former jail inmate of defendant who had not testified at the first trial to the effect that defendant told him he had beaten the victim. Clearly, the principle of double jeopardy prohibited retrial of the intentional murder charge (cf. Matter of Kitt v Haft, 99 AD2d 942, appeal dismissed 63 NY2d 677). Defendant theorizes that the introduction of evidence that he struck the victim was an attempt to circumvent this principle. We disagree. There is a significant amount of evidence, the body of the victim, for example, which was material and relevant to both counts of second degree murder. The mere fact that evidence was relevant to the intentional murder count does not necessarily mean that it was inadmissible at the second trial. The testimony of the former jail inmate was part of the narration of the entire conversation he had with defendant. While evidence that defendant struck the victim may have been essential to the intentional murder charge, it also bore some relevance to the reckless murder charge, particularly with regard to defendant's awareness that the victim was seriously injured. Further, such evidence is relevant in establishing that defendant had a duty to aid the victim, in response to defendant's argument that he was not required to be

a good Samaritan. Thus, such evidence was properly admitted. For the same reason, it cannot be said that this evidence was beyond the scope of the indictment or that the People's proof was at variance from the theory of the indictment.

■ Defendant also alleges as error certain statements made by the prosecution during summation. However, defendant did not preserve these matters for review by making timely objections or requests for corrective instructions (see, CPL 470.05 [2]; *People v Bowden,* 104 AD2d 695, 696), and the comments do not warrant reversal as an exercise of discretion in the interest of justice (CPL 470.15 [6] [a]).

■ Defendant alleges that evidence was admitted at the second trial in violation of the prior decision of the Court of Appeals. At the first trial, the People offered the testimony of Arthur Hitt, a police informant, that defendant told him that he had killed Velzy and had disposed of her body in a wooded area in Delaware County. Defendant and Hitt agreed to move the body to Hitt's logging site in Otsego County where they would bury it. Hitt informed the police of the plan and they had the area staked out when defendant and Hitt arrived. When defendant was removing the victim's body from the trunk of his car, the police officers arrested him, at which point defendant blurted out, "I am sorry; I am sorry. I killed her. I am no good. Please shoot me." Defendant was taken to the police station where he gave a full written confession. Pursuant to a warrant, police officers searched defendant's car and found certain incriminating tangible evidence. Defendant moved prior to the first trial to suppress the statements to Hitt, the admission at the time of the arrest, the written confession and the items found in the car. The Court of Appeals held that the motion to suppress should have been granted, except as to the admission at the time of the arrest which it found to be a spontaneous utterance. Defendant urged at the second trial, and urges on this appeal, that the victim's body, the police officers' testimony regarding what they saw at the time of the arrest and the spontaneous utterance should be suppressed on the theory that they were fruits of the unlawfully obtained statements made to Hitt. We reject this contention on both procedural and substantive grounds.

Defendant's motion to suppress, which the Court of Appeals held should have been granted except for the spontaneous utterance, was limited to the statements to Hitt, the written confession and the evidence seized from the car pursuant to

the warrant. Therefore, the decision of the Court of Appeals was limited to these items of evidence. Defendant never sought to suppress the body of the victim or the gravesite observations of the arresting officers until just before the second trial. Defendant certainly had an opportunity to seek suppression of this evidence prior to the first trial when he sought to suppress the statements to Hitt, the illegality of which forms the basis for defendant's current contention. The decision of the Court of Appeals did not involve any new or novel interpretation of law which would justify the failure to seek suppression of all of the evidence at issue prior to the first trial. Thus, the decision of the Court of Appeals was limited to those items of evidence defendant had timely sought to suppress.

Even if defendant's contention in this regard had been properly raised, we would reject it on the merits. Evidence which is uncovered as the result of an illegal confession must be suppressed as the "fruit of the poisonous tree" (*Wong Sun v United States,* 371 US 471, 484-488; *People v Robinson,* 13 NY2d 296, 301). However, evidence is only tainted where it was uncovered as a direct consequence of the unlawful police action (*People v Boodle,* 47 NY2d 398, 402, *cert denied* 444 US 969). Where discovery of the evidence was not in direct and immediate response to the unlawful police action, such evidence is not tainted by the prior illegality (*supra*). In the instant case, defendant sought out Hitt to provide an alibi for the night of Velzy's disappearance. Hitt reported this to the police. This occurred prior to Hitt's employment as an agent of the police and, thus, was in no way illegal. Since, at that time, the police were conducting an intensive search for the girl, such information obviously would make defendant a suspect. At this point, it would have been perfectly legal for the police to follow defendant and/or Hitt in furtherance of their investigation. Thus, it cannot be said that the police would not have been at the gravesite but for the unlawfully obtained statements to Hitt. Further, the taint of a prior illegality is dissipated where the discovery of the evidence is a result of defendant's independent act as opposed to the unlawful police action (*supra*). In *People v Boodle (supra),* for example, the defendant was unlawfully seized. However, his voluntary act of taking a gun out of his jacket and trying to throw it out the window of the police car dissipated the taint of the unlawful arrest such that the gun was admissible. Here, despite defendant's assertions to the contrary, it appears from

the record that defendant consciously chose to move the victim's body for burial at Hitt's logging site. This strategy was not planned by Hitt or the police. In our view, such independent act, along with the fact that, prior to the illegality, the police had strong reason to investigate defendant, acted to dissipate the taint of the unlawfully obtained statements. Therefore, the victim's body, the police officers' testimony regarding what they saw at the time of the arrest and the spontaneous utterance were properly admitted into evidence.

■ Also raised on this appeal is defendant's contention that the People failed to present a prima facie case to support the charge. Since the jury convicted defendant of the lesser included offense of second degree manslaughter, it acquitted him of the reckless murder charge. Even if there had been insufficient evidence to establish reckless murder, a trial order of dismissal of the entire case would not have been necessary if there was sufficient evidence to support a charge of second degree manslaughter (CPL 290.10 [1]; *see, People v Congilaro,* 60 AD2d 442, 457-458). Thus, whether the People presented a prima facie case to support the reckless murder charge is irrelevant on this appeal. More properly, the issue is whether a prima facie case of the lesser included offense of second degree manslaughter was presented.

The People sought to establish reckless murder by proving that the victim was knocked unconscious, either by being stricken by defendant or by falling or jumping from defendant's moving car, and that defendant failed to transport her for medical care. Expert medical testimony established that death resulted from complications caused by a fractured skull. The experts also opined that, while the skull fracture would not have been apparent to a lay person, the victim would have been rendered unconscious by the blow. The People's expert further testified that death was not instantaneous and that the victim could possibly have survived with prompt medical care. As discussed earlier, the People also introduced the testimony of a former jail inmate of defendant, who had not testified at the first trial, that defendant told him that he had picked up a female hitchhiker and had sexual intercourse with her. After they got into a disagreement, defendant "flipped out" and started "beating on" the girl. He told the inmate that he then put her body in the trunk of his car and later disposed of it in a secluded area. Several police officers testified that on December 12, 1977, three days after the

incident, they saw defendant remove Velzy's body from the trunk of his car. When they approached him to place him under arrest, defendant blurted out, "I am sorry; I am sorry. I killed her. I am no good. Please shoot me."

Manslaughter in the second degree occurs when one "recklessly causes the death of another person" (Penal Law § 125.15 [1]). The term "recklessly" is defined as follows: "A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation" (Penal Law § 15.05 [3]). As pointed out by defendant, had the victim died instantly from the blow, the failure to transport her for medical attention could not constitute second degree manslaughter. However, the jury was free to credit the testimony of the People's expert that the victim did not die instantly and that prompt medical attention could possibly have saved her. There is also evidence that, contrary to defendant's contention, he did not simply ignore her, but affirmatively moved her to a more isolated location, thus preventing any chance that a passing motorist could have aided her. In *People v Kibbe* (35 NY2d 407, 413), a case involving a conviction of reckless murder, the Court of Appeals found the defendants' actions to be a "sufficiently direct cause of the ensuing death" of a man whom they had robbed and left virtually unclothed in a wooded area on a winter night. In the instant case, defendant argues that the victim jumped or fell from his car and that he was under no duty to come to her aid. This contention ignores the testimony of the former jail inmate that defendant had told him that he struck the girl and placed her in the woods. Further, even if it was established that the victim voluntarily leapt from the car, it cannot be said that defendant had no duty to take some sort of action (*see,* Vehicle and Traffic Law § 600; *People v Samuel,* 29 NY2d 252, 258; *People v Slocum,* 112 AD2d 641).

■ Moreover, there is sufficient evidence that defendant acted recklessly. His conduct in leaving an unconscious 18-year-old girl abandoned in an isolated location on a winter night was reckless to the point of being barbaric. Regardless of whether defendant knew that the victim's skull was fractured, abandoning her in these circumstances was reckless.

Therefore, a prima facie case of second degree manslaughter was established.

On similar analysis, we reject defendant's contention that County Court should have charged the lesser included offenses of criminally negligent homicide (Penal Law § 125.10), first degree reckless endangerment (Penal Law § 120.25) and second degree reckless endangerment (Penal Law § 120.20).* It is clear that, under the test set forth in *People v Glover* (57 NY2d 61), these three crimes are lesser included offenses of reckless murder *(see, People v Green,* 56 NY2d 427; *People v Morton,* 100 AD2d 637; *Matter of Louis A.,* 54 AD2d 712). However, there is no reasonable view of the evidence upon which it could be found that defendant committed any of these offenses. The distinction between criminally negligent homicide and the subdivision of second degree manslaughter involved here is simply the culpable mental state: criminal negligence as opposed to recklessness. The failure to perceive a substantial and unjustifiable risk constitutes criminal negligence (Penal Law § 15.05 [4]). Recklessness is found where one is aware of the risk, but consciously disregards it (Penal Law § 15.05 [3]). It is inconceivable that a person could fail to perceive the risk of leaving an unconscious person unattended in an isolated location on a winter night. Under no reasonable view of the evidence was defendant's conduct criminally negligent. If the People's proof is accepted, his conduct could only be reckless.

Defendant's contention that County Court should have charged first and second degree reckless endangerment must also be rejected. Defendant's theory is that a reasonable view of the evidence would support a conclusion that he recklessly placed the victim at risk, but that such conduct did not cause her death. In support, defendant points to the testimony of his expert witness that the victim died very soon after sustaining the head injury and that, even with rapid transportation to a hospital, she would have died. Further, the People's expert witness simply testified that it was *possible* that the victim could have survived with prompt medical attention. It is apparent that, based on the theory of the People's case, if defendant's proof that the victim had died instantly or very soon after the injury is accepted, then he is not guilty of any

---

* Defendant's request to charge unlawful receipt of a body and unlawful removing of a body from a grave (Public Health Law §§ 4217, 4218) was properly denied since these clearly are not lesser included offenses of reckless murder.

of the crimes charged or of reckless endangerment. If, on the other hand, it is believed that the victim could have survived with prompt medical attention, then defendant is guilty of some form of homicide. As stated earlier, the People must establish that a defendant's actions were a "sufficiently direct cause of the ensuing death" *(People v Kibbe,* 35 NY2d 407, 413, *supra).* While it will never be known exactly what chance of survival the victim had, it is clear that, by his conduct, defendant deprived her of that chance. To have submitted reckless endangerment to the jury would have required it to speculate on the victim's chance of survival. Thus, there is no reasonable view of the evidence which would support a charge of reckless endangerment.

 Defendant alleges as error certain other aspects of the jury charge. The jury twice asked how the charge would be affected if the victim had died instantly or if defendant had so believed. Both times County Court answered that the charge presupposed that the victim was alive after she sustained the injuries and that the failure to obtain medical attention caused her death. We disagree with defendant's assertion that the answers were misleading. From the tenor of the questions, it is clear that the jury was cognizant of this crucial factual issue in the case. Further, County Court's answers made it clear that the charge presupposed that the victim was alive. In no way could the answers be misinterpreted to indicate that the jury had to assume that the victim was alive. The jury was free to make a finding of fact on that issue. Further, the jury later specifically asked whether a verdict of not guilty would be necessary if the victim died instantly, to which the parties agreed to answer in the affirmative.

 We also agree with County Court's refusal to grant defendant's special requests to charge. A trial court need not make its charge in the words requested by the defendant. The special requests here were either incorrect, confusing or sufficiently covered by County Court's instructions.

 We now turn to the issues regarding sentencing. Defendant was sentenced as a persistent felony offender based on two previous felony convictions: a 1970 conviction for second degree forgery and a 1974 conviction for first degree attempted sexual abuse. A felony conviction serves as a predicate felony if "a sentence to a term of imprisonment in excess of one year * * * was imposed" (Penal Law § 70.10 [1] [b] [i]). Here, for the 1970 conviction for second degree forgery, a sentence of a five-year probationary term was imposed, not a

sentence of imprisonment. However, due to a subsequent criminal act, defendant was found to have violated his probation. As a result, probation was revoked and defendant was sentenced to a reformatory term of 0 to 4 years. Defendant served slightly more than one year pursuant to this sentence. Once a sentence of probation is revoked, the new sentence takes its place *(see,* CPL 410.70 [5]). In our view, the new sentence can properly form the basis for a predicate felony conviction *(cf. People v Ethrindge,* 36 AD2d 80, *affd* 29 NY2d 766). Further, it has been held that a reformatory sentence suffices as a sentence of imprisonment for the purposes of persistent felony offender sentencing *(People v Williams,* 66 NY2d 629; *People v Murphy,* 99 AD2d 613, 614-615; *People v Jones,* 99 AD2d 559, 560). Lastly, we reject defendant's contention that the prior conviction was unconstitutionally obtained. The record establishes that the plea of guilty to the second degree forgery was knowing and voluntary despite the fact that a full recitation of all of the facts involved may not have been made *(see, People v Harris,* 61 NY2d 9, 16-17).

▮ Finally, we are of the view that the sentence of an indeterminate term of imprisonment of 25 years to life is neither harsh nor excessive. It is true that the sentence imposed here upon the conviction of second degree manslaughter was the same as that imposed upon the conviction of second degree murder after the first trial. However, this cannot be construed as a penalty for defendant having succeeded on appeal. Defendant was not charged as a persistent felony offender after the first trial. Indeed, that was not necessary since second degree murder is a class A-1 felony (Penal Law § 125.25) which carries the same potential sentence as a persistent felony (Penal Law § 70.10 [2]). After defendant was found guilty after the second trial of second degree manslaughter, the People sought to have him sentenced as a persistent felon, the obvious reason being that second degree manslaughter is only a class C felony (Penal Law § 125.15). Considering the heinous nature of the crime and the obvious fact that defendant must be removed from society for the protection of its citizens, we are in accord with County Court's decision to sentence defendant as a persistent felony offender and to impose the maximum sentence authorized.

MAIN, WEISS, YESAWICH, JR., and HARVEY, JJ., concur.
Judgment affirmed.