■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v EDWARD A. DASHNAW, Appellant. [983 NYS2d 681]—

Egan Jr., J. Appeal from a judgment of the County Court of Clinton County (McGill, J.), rendered December 5, 2011, upon a verdict convicting defendant of the crimes of murder in the first degree (two counts), grand larceny in the fourth degree (two counts), criminal possession of stolen property in the fifth degree (three counts) and criminal possession of a forged instrument in the second degree (two counts).

On December 19, 2005, defendant and his girlfriend went to the House of Pine—a furniture business operated by Lorraine Donivan and David Donivan adjacent to their home in the Town of Schuyler Falls, Clinton County—to shop for Christmas presents. While there, defendant, who had delivered furniture for the Donivans in the past, mentioned that he was out of work. In response, Lorraine Donivan allegedly hired defendant to assist her nephew, Corey Desso, with a furniture delivery scheduled for Christmas Eve.

On the morning of December 20, 2005, David Donivan cashed a check for $800 at the Champlain Center North branch of Citizen's Bank in the City of Plattsburgh, Clinton County and, later that same day, was observed gambling at the Akwesasne Mohawk Casino in Franklin County. David Donivan "cashed out" of the casino at approximately 2:00 p.m. and, at some undisclosed point thereafter, returned to his residence.

At roughly the same time that David Donivan was finishing up at the casino, his wife, Lorraine Donivan, met with a customer at the House of Pine. A second customer, who had received a message from Lorraine Donivan earlier that day, spoke with her by telephone around 3:00 p.m. and, at approximately 4:00 p.m., a third customer arrived at the House of Pine to pick up some cushions. As this latter customer started to enter the premises, a man generally matching defendant's description came out and advised her that Lorraine Donivan

was not there.[1] Two days later, on December 22, 2005, another customer arrived at the House of Pine midday and discovered a "[v]ery sloppy" handwritten note posted on the door advising that the business would not be open that day "due to sickness of relitives" [sic].

On Christmas Eve day, Desso drove to the House of Pine to make a previously arranged furniture delivery for a customer. When he arrived, he found the doors to the residence and the warehouse locked and saw defendant inside of the warehouse. When Desso asked defendant how he had gained entry, defendant indicated that Lorraine Donivan had left instructions on how to get in and that he was there to assist Desso with the delivery. Desso then asked to see the note that his aunt allegedly had authored, but defendant was unable to produce it, and Desso's subsequent call to Lorraine Donivan's cell phone went unanswered. After Desso and defendant completed the scheduled delivery, Desso again unsuccessfully attempted to contact his aunt.

As it turned out, Desso was not the only person trying to get in touch with the Donivans. Indeed, between December 20, 2005 and December 29, 2005, more than 30 messages from friends, customers and relatives were left on the Donivans' answering machine, and the State Police twice were dispatched to the residence for a welfare check after the Donivans were reported missing. Additionally, after receiving a call from the Donivans' relatives in Florida, Troy Lapoint, who had worked for the Donivans in the past (and still had keys to the premises), went to the House of Pine on Christmas Day to see if he could locate them. Lapoint discovered a note advising that the Donivans were out of town and, after letting himself into the residence and briefly looking around, he left the premises.[2]

After receiving another call from the Donivans' relatives, Lapoint returned to the House of Pine on December 29, 2005. Lapoint again entered the residence and, after listening to the messages on the answering machine, began walking through the house. Upon entering the Donivans' bedroom, Lapoint noticed that a large area of carpeting had been cut out and removed from the floor. Lapoint then exited the residence and contacted the State Police.

---

**1.** Notably, defendant later related this encounter to two law enforcement officials, but claimed that he ran into this customer as he was leaving the House of Pine at approximately 4:00 p.m. the day before, i.e., December 19, 2005.

**2.** While there, Lapoint observed that the vehicle normally driven by Lorraine Donivan was parked in the garage, but that the 2004 Toyota Tundra pickup belonging to David Donivan was missing.

The State Police arrived and, while searching the residence, discovered the body of David Donivan—wrapped in a section of carpeting—in the basement.[3] A subsequent autopsy revealed that David Donivan had been stabbed a total of 32 times—with the fatal blow consisting of a penetrating wound to the base of his aorta. Based upon David Donivan's defensive wounds and the overall pattern of his injuries, the pathologist who performed the autopsy testified that these injuries were consistent with a frontal attack. Due to the degree of decomposition, a precise time of death could not be determined, but the pathologist testified that the physical findings suggested that David Donivan had been dead for "a week or more."

The State Police continued to search the premises and, two days later, on December 31, 2005, Lorraine Donivan's body was found wrapped in a comforter and hidden in an unheated loft area of the warehouse at the House of Pine; she had been stabbed a total of 10 times, including three blows to the back of her neck, one of which penetrated her brain stem. According to the pathologist who performed the autopsy, Lorraine Donivan most likely was attacked from behind. Although a precise time of death for Lorraine Donivan also could not be established, the pathologist testified that both of the Donivans were stabbed with a single-blade knife—consistent with a knife (as depicted in People's exhibit No. 2) recovered from the Donivans' residence.

Defendant thereafter was indicted and charged with murder in the first degree (two counts), murder in the second degree (two counts), grand larceny in the fourth degree (two counts), criminal possession of stolen property in the fifth degree (three counts) and criminal possession of a forged instrument in the second degree (two counts). Following a jury trial, defendant was convicted of, among other things, two counts of murder in the first degree. Upon appeal, this Court reversed and ordered a new trial (85 AD3d 1389 [2011], *lv denied* 17 NY3d 815 [2011]). At the conclusion of the lengthy retrial, defendant again was convicted of murder in the first degree (two counts), grand larceny in the fourth degree (two counts), criminal possession of stolen property in the fifth degree (three counts) and criminal possession of a forged instrument in the second degree (two counts) and was sentenced to an aggregate prison term of life without parole. Defendant now appeals.

Defendant's claim that the verdict convicting him of two

---

**3.** At some point after the State Police were on the scene, defendant and Desso arrived at the House of Pine—ostensibly to make additional furniture deliveries.

counts of murder in the first degree is against the weight of the evidence is lacking in merit. Insofar as is relevant here, a person is guilty of murder in the first degree when "[w]ith intent to cause the death of another person, he [or she] causes the death of such person . . . and . . . as part of the same criminal transaction, [he or she], with intent to cause serious physical injury to or the death of an additional person or persons, causes the death of an additional person or persons; provided, however, the victim is not a participant in the criminal transaction" (Penal Law § 125.27 [1] [a] [viii]). "Criminal transaction," in turn, is defined as "conduct which establishes at least one offense, and which is comprised of two or more or a group of acts either (a) so closely related and connected in point of time and circumstances of commission as to constitute a single criminal incident, or (b) so closely related in criminal purpose or objective as to constitute elements or integral parts of a single criminal venture" (CPL 40.10 [2]).

We find that there is overwhelming proof to establish defendant as the perpetrator of the charged crimes. Two steak knives (as depicted in People's exhibit No. 5) were recovered from the scene. One of those knives (depicted in People's exhibit No. 2) tested positive for human blood and subsequently was determined to contain David Donivan's DNA. The white towel upon which the steak knives were found contained both defendant's and David Donivan's DNA, and defendant's DNA (extracted from blood evidence at the scene) also was found in the hallway of the residence. Additionally, a bloodied adhesive bandage recovered near Lorraine Donivan's body tested positive for defendant's DNA and, on December 30, 2005, defendant was observed to have a "[h]ealing" cut to the index finger of his left hand.

Further, a number of purchases subsequently linked to defendant were made (both in New York and in Vermont) with the Donivans' credit cards beginning on December 21, 2005 and, beginning on December 22, 2005, defendant cashed three checks drawn on an account belonging to David Donivan.[4] The missing Toyota pickup truck belonging to David Donivan ultimately was found in the parking lot on the Grand Isle (Vermont) side of the

---

4. A handwriting expert testified that Lorraine Donivan was not the signatory on any of the checks at issue—check Nos. 115, 116 and 117—and that David Donivan did not sign check Nos. 115 or 117. Due to the poor reproductive quality of check No. 116, the expert was unable to determine whether David Donivan wrote out or signed check No. 116 and, for similar reasons, was unable to ascertain whether defendant wrote out or was the signatory to the checks at issue.

Lake Champlain ferry,[5] and video surveillance cameras captured the vehicle entering and exiting the parking lot on December 22, 2005 and December 26, 2005. Defendant also was observed passing in front of a video surveillance camera located on a ferry booth at the Grand Isle station on December 27, 2005. Following execution of a search warrant at defendant's residence, State Police discovered a checkbook belonging to the Donivans in defendant's bedroom and David Donivan's casino card and a torn photograph of the Donivans in the trash.[6] Additionally, the State Police discovered four remote control devices, two of which opened the garage doors at the Donivans' residence and the House of Pine warehouse, in a vehicle belonging to defendant's mother.

Finally, when defendant was asked to provide handwriting samples that included the word "relatives," he misspelled that word as "relitives"—the exact misspelling as appeared in the note affixed to the sliding glass doors at the House of Pine on December 22, 2005. Based upon an analysis of defendant's known handwriting and the various exemplars he subsequently provided, a handwriting expert opined that defendant wrote the note in question.

As to the intent element, we are satisfied that the requisite intent may be inferred from the surrounding circumstances—including, among other things, the multiple stab wounds inflicted upon each victim and the defensive injuries sustained by David Donivan (see People v Johnson, 106 AD3d 1272, 1278 [2013], lv denied 21 NY3d 1043 [2013]; People v Callicut, 101 AD3d 1256, 1258 [2012], lv denied 20 NY3d 1096 [2013]). We are equally satisfied that—even in the absence of a definitive time of death for the Donivans—their deaths occurred in sufficient proximity to one another to be deemed part of the same criminal transaction.

Neither Lorraine Donivan nor David Donivan was seen or heard from after mid-afternoon on December 20, 2005. As noted previously, David Donivan cashed out of the casino at approximately 2:00 p.m. that day, and a customer spoke with Lorraine Donivan at approximately 3:00 p.m. that afternoon. By 4:00 p.m., however, another customer had been advised—by a man matching defendant's description—that Lorraine Donivan, who by all accounts was a fixture at the House of Pine, was not on the premises. The Donivans thereafter failed to attend Christmas Eve mass at their church, as had been their custom

---

**5.** A State Police investigator testified that the driver's side door handle and gas tank area on the pickup truck had been "wiped down."

**6.** A similar photograph was found in the Donivans' residence.

for a number of years, and more than 30 messages from friends, relatives and customers would go unreturned between the time the Donivans were last seen on December 20, 2005 and the time their bodies were discovered more than one week later. In the interim, the State Police twice were dispatched to the House of Pine in an attempt to locate the Donivans, and Lapoint also made two visits to the premises at the request of the Donivans' relatives. Again, there was no sign of the Donivans until the discovery of David Donivan's body on December 29, 2005.

Additionally, a subsequent search of the Donivans' residence uncovered two seven-day pill containers—one pink, one blue. In each container, the compartments for Sunday and Monday were empty, and the compartments for Wednesday, Thursday, Friday and Saturday contained multiple pills. The Tuesday compartment in the blue container was empty, while the corresponding compartment in the pink container contained some medication, from which it reasonably could be inferred that the owner of the pink container had taken a portion of the Tuesday medications, while the owner of the blue container had taken all of the medications for that day. Further, although the pathologist who performed the autopsies indeed could not determine a time of death, his testimony did establish that the manner of death was the same for both Lorraine Donivan and David Donivan—multiple stab wounds from a single-blade knife consistent with a knife recovered from their residence containing traces of David Donivan's DNA. Finally, in the days after the Donivans were last seen alive on December 20, 2005, defendant was observed cashing checks drawn on David Donivan's account, driving his Toyota pickup truck and utilizing the Donivans' credit cards to make various purchases.

Simply put, in light of the manner of death and the utter absence of any trace of the Donivans after December 20, 2005, we find ample evidence to support the finding that their deaths were part of the same criminal transaction. Indeed, it strains credulity to suggest that, in the nine days that elapsed between the time the Donivans were last seen alive and David Donivan's body was discovered, one of them—had he or she been alive—would have failed to report his or her spouse missing or failed to return any of the more than 30 messages left on the answering machine at the marital residence. Similarly, it defies logic to suggest that either Lorraine Donivan or David Donivan—had he or she been alive—would have sat idly by while defendant, a recently hired employee, drove one of their vehicles, used their credit cards to make personal purchases, utilized their garage door openers to access the business premises and coordinated

furniture deliveries. In short, we are satisfied that the jury's verdict is in accord with the weight of the evidence.

Defendant next contends that he was denied his right to a fair trial based upon comments made by County Court during the course of voir dire—specifically, defendant takes issue with County Court's decision to advise potential jurors that his prior conviction had been reversed and that the matter had been remitted for a new trial. Inasmuch as defendant failed to register any objection to County Court's remarks during voir dire, his argument on this point has not been preserved for our review (*cf. People v Ukasoanya*, 101 AD3d 911, 912-913 [2012], *lv denied* 21 NY3d 1020 [2013]; *People v Pilgrim*, 100 AD3d 932, 932 [2012], *lv denied* 21 NY3d 913 [2013]; *People v Addison*, 94 AD3d 1539, 1540 [2012], *lv denied* 19 NY3d 994 [2012]; *People v Terry*, 85 AD3d 1485, 1487 n 2 [2011], *lv denied* 17 NY3d 862 [2011]) and, in any event, is lacking in merit.

Although a criminal defendant unquestionably "has a constitutional right to a fair trial by a panel of impartial jurors" (*People v Knapp*, 113 AD2d 154, 158 [1985], *cert denied* 479 US 844 [1986]; *see People v Rodriguez*, 71 NY2d 214, 218 [1988]), "extensive knowledge in the community of the crime and the accused is not sufficient [in and of] itself to establish that a [particular] trial was unfair" (*People v Knapp*, 113 AD2d at 158). Notably, courts consistently have held that "jurors need not be totally ignorant of the facts and issues involved" in a particular case (*People v Jean-Pierre*, 169 AD2d 932, 932 [1991], *lv denied* 77 NY2d 962 [1991] [internal quotation marks and citation omitted]; *see Irvin v Dowd*, 366 US 717, 722 [1961]; *People v Harris*, 19 NY3d 679, 686-687 [2012]; *People v Culhane*, 33 NY2d 90, 110 [1973]; *People v Knapp*, 113 AD2d at 158).

Here, although County Court indeed advised each prospective panel of jurors that defendant's conviction had been reversed and that this matter was being retried, County Court also appropriately and repeatedly instructed the potential jurors that defendant was presumed to be innocent, that the underlying indictment did not constitute proof of guilt, that the jurors selected must decide the case based only upon the facts presented to them and that they could not form any opinions prior thereto. Additionally, County Court permitted extensive questioning regarding the potential jurors' prior knowledge of the case, and defendant was afforded ample opportunity to eliminate jurors who exhibited bias or displayed any inability or unwillingness to render an impartial verdict (*see People v Knapp*, 113 AD2d at 158). Accordingly, "[v]iewing the totality of the circumstances, including the general atmosphere of the com-

munity, the conduct of jury selection, and the trial in general," we cannot say that County Court's comments deprived defendant of a fair trial (*People v Pepper*, 89 AD2d 714, 715 [1982], *affd* 59 NY2d 353 [1983]).[7]

Defendant's related claim—that defense counsel's failure to object to County Court's comments amounted to the ineffective assistance of counsel—is equally unpersuasive. "[J]ury selection involves the quintessentially tactical decision of whether [a] defendant's interests would be assisted or harmed by a particular juror" (*People v Molano*, 70 AD3d 1172, 1176 [2010], *lv denied* 15 NY3d 776 [2010] [internal quotation marks and citation omitted]). Here, counsel's tactical decision to thoroughly explore each potential juror's prior knowledge of the case in an effort to ascertain the extent to which either the pretrial publicity or this Court's reversal of the prior judgment of conviction may have influenced the juror's ability to return a fair and impartial verdict reflected a legitimate trial strategy (*cf. People v Anderson*, 113 AD3d 1102, 1103 [2014]; *People v Pinkney*, 90 AD3d 1313, 1316-1317 [2011]; *People v Garrow*, 75 AD3d 849, 852 [2010]) and, based upon our review of the record as a whole, we are satisfied that defendant received the effective assistance of counsel.

We also are satisfied that County Court conducted a sufficient inquiry before granting defendant's mid-trial request to proceed pro se. As the accused, "defendant is entitled to be [the] master of his own fate and respect for individual autonomy requires that he be allowed to go to [prison] under his own banner if he so desires and if he makes the choice with eyes [wide] open" (*People v Vivenzio*, 62 NY2d 775, 776 [1984] [internal quotation marks and citation omitted]). Accordingly, "[a] defendant in a criminal case may invoke the right to defend pro se provided: (1) the request is unequivocal and timely asserted, (2) there has been a knowing and intelligent waiver of the right to counsel, and (3) the defendant has not engaged in conduct which would prevent the fair and orderly exposition of the issues" (*People v McIntyre*, 36 NY2d 10, 17 [1974] [italics omitted]; *accord Matter of Kathleen K. [Steven K.]*, 17 NY3d 380, 385 [2011]; *Matter of State of New York v Timothy BB.*, 113 AD3d 18, 21 [2013]; *People*

---

**7.** To the extent that defendant specifically takes issue with County Court's statement that it was "stuck" with the retrial—the need for which, in turn, was predicated upon a "procedural mistake" or "technicality"—we note that these comments were addressed to either the second panel of potential jurors, which was struck in its entirety, or the panel from which three of the ultimately discharged alternates were derived. In any event, viewed in the context of voir dire as a whole, these isolated statements did not deprive defendant of a fair trial.

*v Atkinson*, 111 AD3d 1061, 1062 [2013]). The waiver element, in turn, requires the trial court to undertake a " 'searching inquiry' " (*People v Slaughter*, 78 NY2d 485, 491 [1991], quoting *Faretta v California*, 422 US 806, 835 [1975]) geared toward "accomplish[ing] the [twin] goals of adequately warning [the] defendant of the risks inherent in proceeding pro se, and apprising [the] defendant of the singular importance of the lawyer in the adversarial system of adjudication" (*People v Smith*, 92 NY2d 516, 520 [1998] [italics omitted]; *accord People v Crampe*, 17 NY3d 469, 482 [2011], *cert denied sub nom. New v Wingate*, 565 US —, 132 S Ct 1746 [2012]; *see People v Anderson*, 94 AD3d 1010, 1012 [2012], *lv denied* 19 NY3d 956 [2012]). Notably, "[t]he focus in a self-representation inquiry is not on how much the defendant knows about criminal law and procedure, because ignorance does not preclude self-representation. Instead, the principal focus is on warning a defendant that his or her *lack* of knowledge, relative to that of a lawyer, will be detrimental if the defendant chooses to waive the right to counsel" (*People v Sealy*, 102 AD3d 591, 591 [2013], *lv denied* 21 NY3d 1009 [2013] [citation omitted]). In ascertaining the sufficiency of the trial court's inquiry, "a reviewing court may look to the whole record, not simply to the waiver colloquy, in order to determine if a defendant effectively waived counsel" (*People v Crampe*, 17 NY3d at 482 [internal quotation marks and citations omitted]; *see People v Thomas*, 73 AD3d 1223, 1224 [2010], *lv dismissed* 15 NY3d 779 [2010]).

Here, there is no question that defendant's mid-trial request to proceed pro se—made some three weeks after the trial commenced—was untimely (*see People v Race*, 78 AD3d 1217, 1218 [2010], *lv denied* 16 NY3d 835 [2011]). Faced, however, with defendant's repeated, articulate and impassioned pleas to represent himself, County Court elected—in an exercise of its discretion—to consider the merits of defendant's request. Although defendant now faults County Court's decision in this regard, we cannot say—under the particular facts of this case—that reversal upon this ground is warranted.

To be sure, the Court of Appeals has held that once a trial has commenced and witnesses have testified, a defendant's "right [to proceed pro se] is severely constricted and the trial court must exercise its sound discretion and grant the request only under compelling circumstances" (*Matter of Kathleen K. [Steven K.]*, 17 NY3d at 387 [internal quotation marks and citation omitted]; *see People v Morales*, 12 AD3d 1126, 1126-1127 [2004], *lv denied* 4 NY3d 746 [2004]; *People v Bell*, 234 AD2d 378, 378 [1996], *lv denied* 89 NY2d 1088 [1997]). The rationale for this

rule, however, stems from concerns regarding "the potential for obstruction and diversion" that may attend a defendant's decision—or be part of a defendant's strategy—to abandon representation in the midst of the trial, as well as a desire to "avert[ ] delay and confusion" (*People v McIntyre*, 36 NY2d at 17). Such concerns were not an issue here, however, and it is clear that, under appropriate circumstances and following sufficient inquiry, mid-trial requests to proceed pro se may be granted (*see People v Chandler*, 109 AD3d 1202, 1203 [2013]; *see also People v Arroyo*, 98 NY2d 101, 104 [2002]). Based upon our review of the record as whole, and taking into consideration defendant's insistence that he be allowed to proceed pro se, we are satisfied that County Court did not abuse its discretion in considering the merits of defendant's request.

As to the sufficiency of County Court's inquiry, suffice it to say that County Court—repeatedly and in great detail—apprised defendant of the perils and pitfalls of proceeding pro se and went to great lengths to dissuade defendant from doing so. Specifically, County Court cautioned defendant that, while he may have been well versed with the facts of his case, "[t]he practice of law [was] not a simple process" and entailed education and experience that defendant did not possess. County Court went on to note the then-impending testimony of the People's handwriting and DNA experts and suggested that defendant consider the legal expertise that counsel could bring to examining those witnesses. Additionally, County Court advised defendant that, if he proceeded pro se, he would be held to the same standard as an attorney and would be responsible for the "day-to-day operation of the [trial]," which would include making appropriate objections and motions, cross-examining the People's witnesses, conducting his defense and preparing a summation. In this regard, County Court expressly warned defendant that his ability to introduce certain evidence or effectively argue any applicable motions likely would be hampered by his lack of legal training, and defendant was afforded ample opportunity to consider (and reconsider) his request and to discuss the matter with counsel.

To be sure, County Court's inquiry could have been more seamless, but the Court of Appeals has expressly rejected a strict, formulaic approach in this regard, requiring only that the record as a whole "affirmatively disclose that a trial court has delved into a defendant's age, education, occupation, previous exposure to legal procedures and other relevant factors bearing on a competent, intelligent, voluntary waiver" (*People v Arroyo*, 98 NY2d at 104 [internal quotation marks and citations omit-

ted]; *see People v Providence*, 2 NY3d 579, 583 [2004]; *People v Anderson*, 94 AD3d at 1012). Having presided over the first trial, County Court was aware of defendant's education, background and familiarity with legal proceedings (*see People v Yu-Jen Chang*, 92 AD3d 1132, 1134 [2012]), and nothing in the record suggests that defendant's competency was in issue. Under these circumstances, County Court did not abuse its discretion in granting defendant's request to proceed pro se with standby counsel (*see People v Vivenzio*, 62 NY2d at 776; *People v Yu-Jen Chang*, 92 AD3d at 1134).

Defendant's remaining arguments, to the extent not specifically addressed, have been examined and found to be lacking in merit.

Peters, P.J., Lahtinen and Rose, JJ., concur. Ordered that the judgment is affirmed.